**LEVER BROTHERS COMPANY,**
**Plaintiff,**

v.

**AMERICAN BAKERIES COMPANY,**
**INC., Defendant.**

No. 78 CV 1648 (ERN).

United States District Court,
E. D. New York.

April 1, 1982.

Brumbaugh, Graves, Donohue & Raymond by Joseph D. Garon, Eugene V. Handy, Jr., New York City, for plaintiff.

Holland, Armstrong, Wilkie & Previto by Joseph J. Previto, New York City (McWilliams, Mann & Zummer by Thomas F. McWilliams and Dennis M. McWilliams, Chicago, Ill., of counsel), for defendant.

## MEMORANDUM OF DECISION AND ORDER

NEAHER, District Judge.

This action for injunctive relief against alleged infringement of plaintiff's trademark AUTUMN was tried by the court upon the facts. Jurisdiction is grounded upon 15 U.S.C. § 1121 and 28 U.S.C. §§ 1332 and 1338. The facts and legal discussion which follow constitute the court's findings and conclusions, Rule 52, F.R. Civ.P.

Plaintiff, Lever Brothers Company ("Lever"), is a Maine corporation having its principal place of business in New York City. Lever, which has conducted business in the United States since 1895, sells a variety of consumer products, including detergents, soaps, toothpaste and food products. Among its food products is margarine sold under the trade names AUTUMN, PROMISE and IMPERIAL, and such items as MRS. BUTTERWORTH'S syrup and pancake mix, LUCKY WHIP dessert topping and SPRY shortening. AUTUMN margarine, which came on the market in 1975, was developed and advertised as a natural margarine product, and in October 1975 Lever obtained a trademark registration for AUTUMN without opposition.

Defendant, American Bakeries Company, Inc. ("American"), is a Delaware corporation having its principal place of business in Chicago, Illinois. American sells bread and other bakery products throughout the United States. These are produced and distributed by a number of primary baking divisions utilizing the trade names Taystee, Merita, Langendorf and Cook Book.

The controversy between the parties arises out of American's decision in April 1977 to adopt AUTUMN GRAIN as a trade name for a grain-type bread it had developed to meet competition from others. The decision was made after a trademark search and advice from house counsel had cleared AUTUMN GRAIN for use. The search disclosed Lever's registration for AUTUMN, as well as similar registrations by others: AUTUMN GOLD (frozen turkeys), AUTUMN LEAVES (candy), AUTUMN CRISP (apples), AUTUMN CHERRY (wine), and AUTUMN WIND (whiskey).

On April 22, 1977, American filed its application for registration of AUTUMN GRAIN, and notice for opposition purposes was published by the Patent and Trademark Office on December 13, 1977. The application disclaimed any exclusive right in the term GRAIN apart from its use in the composite mark AUTUMN GRAIN. In July 1978, Lever filed a notice of opposition against American's application on the basis of its prior registration for AUTUMN. After commencement of this action, however, Lever moved to suspend the opposition proceeding, and that motion was granted on February 5, 1979, by the Trademark Trial and Appeal Board.

Lever's AUTUMN margarine is sold in two different forms, tub and stick, and the packaging for each prominently displays the AUTUMN trademark in a distinctive typeface. The primary color scheme for the packaging is red, white, brown and gold, representing the colors of autumn, and is designed to create the image of a "natural" margarine product. Lever's name appears in small type on the bottom panel of the packaging; therefore, the trademark forms the principal basis for consumer recognition.

Original marketing of AUTUMN margarine began in California in 1975 after initial sales in interstate commerce earlier that year from Lever's office in Edgewater, New Jersey to retail stores in Massachusetts and Maine. The initial marketing effort, however, was concentrated in Los Angeles because that area was known to have a relatively high interest in natural-type products. The promotion was accompanied by extensive television commercials and print advertising portraying the use of AUTUMN margarine on bread or crackers. The print advertisements also featured recipes using AUTUMN margarine for making bread and stuffing. The impact of the television advertising was tested by means of consumer surveys in which people were interviewed as to their recall of television

commercials for AUTUMN margarine within 24 hours of the commercial. AUTUMN margarine scored a significantly high recall rating of approximately 30%, which compared favorably to the 20% rate for most food products.

That a considerable investment for advertising was made by Lever in promoting AUTUMN margarine is evident from the following table of expenditures for such purpose:

| 1975 | $ 223,000 | |
| 1976 | 524,000 | |
| 1977 | 405,000 | |
| 1978 | 205,000 | |
| 1979 | 1,316,000 | |
| 1980 | 945,000 | (10 months) |

Since AUTUMN margarine is generally sold to housewives, Lever's advertising of the product is directed to women, particularly those between the ages of 21 and 35. In both television commercials and print advertising, two basic themes are presented: that AUTUMN margarine is the first natural margarine, i.e., one free from artificial preservatives or coloring, and that it tastes good.

AUTUMN margarine, which generally retails for between 89¢ and 93¢ a package, is sold through two basic channels of trade: (1) directly to large supermarket chains; and (2) to wholesalers who, in turn, sell and distribute it to smaller retail accounts, usually chain supermarkets, independent supermarkets, and small grocery stores. Total sales of the product since 1975 have been as follows:

| 1975 | $ 247,000 | |
| 1976 | 1,198,000 | |
| 1977 | 1,152,000 | |
| 1978 | 1,211,000 | |
| 1979 | 4,056,000 | |
| 1980 | 3,864,000 | (10 months) |

American presently uses the mark AUTUMN GRAIN only on bread. The bread wrappers bear the mark in lettering almost identical with Lever's AUTUMN mark except for color and the added expression "natural grains." Aside from the prominent designation "AUTUMN GRAIN Bread," the source of the product is identified by the "house mark" of the regional bakery, i.e., Merita, Langendorf, Taystee or Cook Book, displayed in white lettering in red ovals on the panels of the wrapper. American's name appears only inconspicuously on a side panel.

American's AUTUMN GRAIN bread is generally displayed and sold from "self-service" shelves in the same type of stores as AUTUMN margarine, i.e., retail grocery stores and supermarkets. Its sale is also promoted through advertisements in newspapers and television commercials, which are directed toward women, particularly housewives, and stress the "natural" qualities of its ingredients and taste.

Since April 1977, when it was introduced, American has sold some 50 to 60 million loaves of AUTUMN GRAIN bread, which wholesales at about 65¢ a loaf, for a total value of about $43,000,000. The majority of these sales occurred in the southeastern portion of the United States, in contrast to the bulk of AUTUMN margarine sales which have been made in California, Oregon and Washington.

*The Claims in Contention*

Although Lever charges American with trademark infringement, unfair competition, false designation of origin and dilution of its valuable trademark AUTUMN on margarine, it acknowledges that it has not uncovered any evidence of actual confusion, and the court finds no evidence of actual competition between the parties. Nevertheless, Lever contends it has made a sufficiently strong showing of a likelihood of confusion among ordinary purchasers as to the source of origin of American's bread. Lever emphasizes the virtually identical lettering of AUTUMN as it appears on the packaging of the respective products, the "peculiar" circumstances of American's adoption of AUTUMN and its disclaimer of any registration for GRAIN, the imitative tenor of American's advertising themes, the functional interrelatedness of margarine and bread, and the possibility that Lever will extend its line of food products to

include a long shelf-life bread product now being marketed in Europe by its parent company, Unilever.

American, denying any infringement or bad faith in its adoption and use of AUTUMN GRAIN, stresses the dissimilarity of the products, their different handling in stores selling them, the absence of any evidence of actual confusion on the part of purchasers, the prevalence of autumn colors in bread packaging and of the expression "natural" in the food field, and the apparent acceptance of AUTUMN GRAIN by the Patent and Trademark Office despite the other AUTUMN registrations. Essentially, American argues that under the precedents in this Circuit, the court should conclude that there is no likelihood of confusion based upon the simultaneous use of AUTUMN for margarine and AUTUMN GRAIN for bread, and that in any event, the balancing of equities as between the parties should preclude injunctive relief which could only seriously disadvantage American economically and would not advantage Lever in the circumstances.

*Discussion*

■ There is no question that the products involved in this trademark controversy, although different and noncompeting, are closely related in point of purchase and use. The crucial question is whether the use of AUTUMN on these differing but related products, and in their promotion, creates "any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *Mushroom Makers, Inc. v. R. G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir. 1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979). As pointed out by the District Court in *Mushroom Makers*, the fact that "the products are not identical does not foreclose relief to the senior owner [of the trademark] if they are sufficiently related to make confusion likely." 441 F.Supp. 1220, 1225 (S.D.N.Y.1977) (footnote omitted).

■ Factors to be considered in this Circuit in determining the senior user's right

to relief where the products in question are non-competitive, but related, are outlined in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961):

> "Where the products are different, the prior owner's chance of success is a function of many variables: the strength of his mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers. Even this extensive catalogue does not exhaust the possibilities—the court may have to take still other variables into account."

Accord, *Mushroom Makers, Inc. v. R. G. Barry Corp., supra*, at 47; *Scarves by Vera, Inc. v. Todo Imports Ltd.*, 544 F.2d 1167, 1173 (2d Cir. 1976); *Kiki Undies Corp. v. Promenade Hosiery Mills, Inc.*, 411 F.2d 1097, 1099 (2d Cir. 1969), *cert. dismissed*, 396 U.S. 1054, 90 S.Ct. 707, 24 L.Ed.2d 698 (1970).

(a) *Strength of the Mark*

■ "The term 'strength' as applied to trademarks refers to the distinctive use of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous, source." *McGregor-Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1131 (2d Cir. 1979). See also *Gioia Macaroni Co. v. Joseph Victori Wines*, 205 U.S.P.Q. 986, 988 (E.D.N.Y.1979); *E. I. DuPont de Nemours & Co. v. Yoshida Int'l, Inc.*, 393 F.Supp. 502, 512 (E.D.N.Y.1977). The strength or distinctiveness of a mark determines both the ease with which it may be established as a valid trademark and the degree of protection it will be accorded. An arbitrary or fanciful mark is considered the strongest type of mark and is therefore ordinarily entitled to a wider scope of protection from infringers. See 3 R. Callmann, The Law of Unfair Competition Trademarks and Monopolies, § 74.1 at 226 (3rd ed. 1969).

■ AUTUMN, albeit a common word, must be considered arbitrary when used in connection with a margarine product. According to Lever's evidence, which is uncontradicted, the word was chosen because it was not generic of the product and, more importantly, was suggestive of the "natural" quality of the margarine that Lever's advertising sought to promote. Lever's purpose in adopting the mark, however, cannot be controlling in determining its strength. The evidence also discloses that AUTUMN has been in common use as a mark for food and drink products dating back to 1932, long before Lever's use. Pl. Exh. 13. As Callmann aptly points out, "a claim of priority is utterly inconsistent with common use." *Id.* at 228. Thus it cannot be said that the AUTUMN mark on margarine possesses such distinctiveness as to bar its use on a non-competitive food product.

#### (b) *Degree of Similarity*

■ In determining the degree of similarity between two marks, the law does not require a microscopic examination or analysis of the elements of the marks. The purchasing public does not generally dissect a mark. Rather, the public is left with a general impression of the mark, and it is this impression which gives rise to the likelihood of consumer confusion. *Stix Products Inc. v. United Merchants & Manufacturers Inc.*, 295 F.Supp. 479, 494 (S.D.N.Y. 1968).

■ Here, the packaging of the respective products unquestionably features AUTUMN as the primary word in virtually identical distinctive typeface. But as was explained in *McGregor-Doniger Inc. v. Drizzle Inc., supra,* at 1133, "even close similarity between two marks is not dispositive of the issue of likelihood of confusion." Rather, the impact of the similarity must be appraised in light of the context in which

the respective marks are generally presented.

Stressing the symbiotic relationship between bread and margarine, Lever points out that its television commercials and print advertising always feature AUTUMN margarine in conjunction with bread. The bread, however, is usually anonymous, and the advertisements are unlikely to create the impression that the margarine sponsor also produces bread. The packaging of the respective products would be the more likely source of confusion were it not for significant differences which overshadow the similarity in typeface. On Lever's cardboard package for both tub and stick margarine, "AUTUMN Natural Margarine" appears against the background of a picturesque farm scene. Pl.Exhs. 84, 85. Depending upon the sensitivity of the consumer, this may engender thoughts of naturalness, freshness and wholesomeness, but hardly more. American's packaging, on the other hand, is the familiar bag wrapping generally used for bread, clearly depicting the name "AUTUMN GRAIN Bread," as opposed to merely AUTUMN.[1] "Natural Grains" also appears on side panels of the wrapper, but similar expressions are common on bread wrappers, Def.Exhs. 1, 4, 5–7, 12, 14, 16, 18, 19, and cannot be viewed as a source of confusion with Lever's natural margarine.

■ In sum, although the packaging for both products share the common word AUTUMN in similar typeface, the context in which the marks appear is so dissimilar as to negate the likelihood of confusion on the part of purchasers. This conclusion is further supported by the prominent identification on the bread packages of American's regional bakery divisions, *e.g.,* Merita, Tastee, Langendorf or Cook Book, which very likely are familiar to consumers in those regions.

---

1. As Lever points out, the Patent and Trademark Office required American to delete from its application the generic term "bread" and the descriptive term "grain." Although not binding on the court, the Examiner found "no resemblance with any registered mark likely to cause confusion or to cause mistake, or to deceive." Pl.Exh. 64.

#### (c) *Proximity of the Products*

The degree of proximity of the products must be considered here not because a consumer would purchase American's bread product as an alternative to AUTUMN margarine. Rather, as already indicated, it bears on the likelihood of consumers being confused as to the source of the respective products, *Gioia Macaroni Co. v. Joseph Victori Wines, supra*; or that indirect harm will result to the senior user through loss of goodwill or tarnishment of reputation. *Scarves by Vera, Inc. v. Todo Imports Ltd., supra*, at 1172.

 The factors to be considered regarding the "proximity" of non-competing goods were aptly stated by Callmann in his treatise on trademarks:

> "The impression that non-competing goods are from the same origin may be conveyed by such differing considerations as the physical attributes or essential characteristics of the goods, with specific reference to their form, composition, texture or quality, the service or functions for which they are intended, the manner in which they are advertised, displayed or sold, the place where they are sold or the class of customers for whom they are designed and to whom they are sold." 3 R. Callmann, *supra*, § 82.2(c) at 807.

Lever urges that a strong degree of proximity exists based upon the acknowledged fact that bread and margarine are naturally allied products in the minds of the consuming public. In fact, as previously noted, Lever uses them together to advertise and promote AUTUMN margarine. Specifically, Lever argues that bread and margarine are both sold in supermarkets, convenience stores and neighborhood groceries; that both products are low-priced essentials in the American diet; that the purchaser of a bread product will very likely purchase margarine; that both products are generally purchased from self-service racks or display cases without the aid of store assistants; and that most commonly, the consumer picks the products up without inquiring as to its source. Consequently, Lever contends, reliance upon the trademark in these off-the-shelves situations is great.

Nevertheless, the absence of any evidence of confusion on the part of consumers derogates from the significance of proximity. Although actual confusion need not be shown, where both products have been on the market for over three years, during which time 13 million packages of AUTUMN margarine and over 50 million loaves of AUTUMN GRAIN bread have been sold, the absence of even a single instance of confusion becomes significant. See *Mushroom Makers, Inc. v. R. G. Barry Corp., supra*, at 48. Moreover, the various customer complaints in evidence from purchasers of AUTUMN GRAIN bread indicate no confusion as to the source of the product: the complaints were unerringly registered with American, not Lever. Pl. Exh. 108. The reason seems obvious. Despite their proximity, bread and margarine are different products accorded wholly distinct treatment in handling and sale. The products are invariably segregated, for margarine requires refrigeration and is found in the dairy section of a store, while bread is shelved separately in a baked goods section. The evidence shows, therefore, that the disparate nature of the goods, the source of origin information on the packages, the absence of actual confusion, and the distinct treatment by retailers prevent any likelihood of confusion caused by proximity.

#### (d) *Quality of Defendant's Product*

Lever contends that because of the close similarity of trademarks, consumer dissatisfaction with AUTUMN GRAIN bread may disparage Lever's product. Lever points to the concession of American's executive vice-president that American has no control over at least some of the bread it sells, particularly in Cook Book's Houston and Amarillo, Texas, plants, which are apparently operated by a third party. In our consideration of the proximity factor, however, we have

pointed out that the few customers who had complaints about American's bread had no difficulty directing them to American.

Granted that the good reputation associated with a senior user's mark is a primary interest which our trademark laws seek to protect, *Scarves by Vera, Inc. v. Todo Imports Ltd., supra*, at 1172, the rule has no application here. The satisfactory quality of AUTUMN GRAIN bread is rather solidly demonstrated by American's sales of some 50 to 60 million loaves having a sales value of about $43,000,000, since the middle of 1977 when distribution began. Even assuming that a loaf of bread has a shorter life and is purchased more often than a package of margarine, American's sales certainly compare favorably with Lever's, whose sales of AUTUMN margarine total about $13,000,000 since 1975. Thus there is no basis in the evidence for finding that the continued sale of AUTUMN GRAIN bread would diminish the value of Lever's mark for margarine.

### (e) *Sophistication of the Buyer*

This element of the *Polaroid* test requires consideration of the sophistication—or naivete—of the purchaser of the products in question. *Polaroid Corp. v. Polarad Electronics Corp., supra*, at 495. Again, Callmann states the issue well:

> "The general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and given the attention such purchasers usually give in buying that class of goods, is the touchstone." 3 R. Callman, *supra*, § 81.2 at 577.

The ordinary purchaser of bread and margarine will not stop to analyze the intricacies of trademarks or packaging. The typical market is such as to stimulate sales based on impulse, not introspection; purchase decisions are governed by appearances and general impressions, not in-depth analysis. Considering the nature of the goods, the bustling, self-service atmosphere of a typical supermarket in which over

5,000 trademarked items are presented, and the frequency of purchase, little more is required to conclude that the ordinary purchaser of AUTUMN margarine and AUTUMN GRAIN bread is a casual, unsophisticated buyer. Additionally, the low price of each item indicates that the normal buyer will exercise relatively less caution, making confusion more likely. See *Harold F. Ritchie, Inc. v. Chesebrough-Pond's, Inc.*, 281 F.2d 755, 762, n.19 (2d Cir. 1960).

### (f) *Bridging the Gap*

This expression describes "the senior user's interest in preserving avenues of expansion and entering into related fields." *Mushroom Makers, Inc. v. R. G. Barry Corp., supra*, at 1228. In this regard, Lever points out it has expanded several of its successful products into related markets. Further contending that it is not uncommon for both bread and margarine to be sold under the same mark, Lever cites its history of line extensions in other contexts:

| Original Product | Line Extension |
| --- | --- |
| DOVE toilet bar | DOVE dishwashing liquid |
| LUX toilet bar | LUX dishwashing liquid |
| ALL detergent | ALL liquid detergent |
| IMPERIAL margarine | Diet IMPERIAL margarine |
| MRS. BUTTERWORTH'S syrup | MRS. BUTTERWORTH'S pancake mix |

Unquestionably, an important purpose of the trademark laws is protection of legitimate potential and expansion into related fields. *S. C. Johnson & Sons, Inc. v. Johnson*, 175 F.2d 176 (2d Cir. 1949). Nevertheless, Lever has failed to present evidence of the likelihood of bridging the gap in this instance. Its previous extensions fail to indicate a present likelihood because none involved products as distinct as bread and margarine. Nor does the evidence establish the likelihood that Lever will follow the example of its European parent in marketing a long shelf-life bread or even that it would adopt AUTUMN for such a product. In fact, at no point in its 85-year existence has Lever entered the baked goods market. Thus, the totality of

evidence fails to show the likelihood that Lever will extend its AUTUMN line to the field into which American has entered.

### (g) *Good Faith*

■ American's adoption of AUTUMN in a logotype form virtually identical with that appearing on Lever's packaging raises an inference of intentional imitation. The inference is supported by the testimony of Raymond J. Lahvic, American's marketing vice-president, that manufacture of AUTUMN GRAIN packaging began six to eight weeks *before* house counsel had given trademark clearance. The trademark tracer report upon which he acted is dated April 17, 1977, Pl.Exh. 13, and disclosed the registration of Lever's AUTUMN mark on October 21, 1975. Significantly, however, the report also revealed, as previously mentioned, a number of other registrations which used AUTUMN in combination with another word for a variety of food and drink products. Further, American's officials denied under oath that they were aware of Lever's AUTUMN mark when the initial decision was made to adopt AUTUMN GRAIN. These denials can be credited in light of the evidence that until 1979 AUTUMN margarine remained largely a test product in the Los Angeles area, whereas American developed AUTUMN GRAIN bread to compete with a grain-type bread marketed in North Carolina. Moreover, American rejected the use of HARVEST GRAIN because of prior registrations, which indicates defendant's process of decision was reasoned and in good faith. In these circumstances, the adoption of similar typeface on different packaging for distinct products cannot alone justify a finding of American's bad faith.

### Conclusion

■ As in *Mushroom Makers* there is no evidence that plaintiff has been or will be damaged by American's use of AUTUMN GRAIN. The court finds defendant's mark was adopted in good faith without intent to benefit from Lever's business reputation or to palm off or deceive the public as to origin of American's product. Nor is there any evidence that any purchasers of either party's product have been or will be in any way confused, deceived or misled. Since AUTUMN is a common word which has frequently been registered as a trademark for various food or beverage products prior to Lever's use, Lever does not have the right to preempt uses of the mark on other food products, particularly when, as here, the mark is coupled with a modifying word which precludes the likelihood of confusion. In the circumstances, considering the substantial investment American has made in its mark, the good will it has gained through substantial sales of its product and the absence of likelihood of any future confusion, it would be inequitable to bar American from further use of its mark.

■ Accordingly, the court concludes that plaintiff is not entitled to relief under 15 U.S.C. §§ 1114 or 1125; and having failed to prove the likelihood of injury to its business reputation or the distinctiveness of its mark, plaintiff has not met the statutory prerequisites to relief under N.Y.Gen. Bus.Law § 368–d.

The Clerk of the Court is directed to enter judgment for defendant, and to forward copies of these findings of fact and conclusions of law to counsel for both parties.

SO ORDERED.