**PLAYTEX PRODUCTS, INC., Plaintiff,**

**v.**

**FIRST QUALITY HYGIENIC,
INC., Defendant.**

**No. 96 CV 5656 (TCP).**

United States District Court,
E.D. New York.

Dec. 31, 1996.

**340**

Nancy J. Mertzel, Jeffrey A. Schwab, Abelman Frayne & Schwab, New York City, for Playtex Products, Inc.

James W. Badie, Stoll, Miskin, Previto, Hoffman & Badie, New York City, for First Quality Hygienic, Inc.

PLATT, District Judge.

Plaintiff Playtex Products, Inc. ("Playtex"), by Order to Show Cause filed 22 November 1996, seeks a preliminary injunction enjoining defendant First Quality Hygienic, Inc. ("First Quality") from selling tampons competitive with those sold by Playtex. Specifically, First Quality has announced publicly its intention to sell, and has begun advertising, tampons under the trade name "Gentle Touch." Playtex asserts that use of "Gentle Touch" will cause consumers to confuse First Quality's tampons with Playtex's "Gentle Glide" tampons, will constitute use of false designations of origin, will dilute the distinctive quality of the "Gentle Glide" mark, all in violation of the Lanham Act, and will violate the common law prohibition against unfair competition. Playtex asserts that it is entitled to a preliminary injunction because it is

likely to succeed on the merits and First Quality's intended use will cause it immediate and irreparable injury.

## BACKGROUND

Playtex is the second largest tampon manufacturer in the United States. Its best selling products are sold under its "Gentle Glide" trademark. Playtex coined that mark in 1973 for use with its dome-tipped applicator products. Playtex has used the mark continuously since that time and has sold billions of dollars worth of products under the mark. Playtex registered the "Gentle Glide" mark for "tampon applicators sold as a unit with tampons" on 6 May 1975, and renewed that registration on 29 August 1995. (Ex. 2 to Dores Decl.) Current packaging indicates that Playtex's dome-tipped tampons and their applicators have come to be associated with the "Gentle Glide" mark.

Playtex has expended the following sums to promote public awareness of the "Gentle Glide" mark and the tampon products associated with the mark: for 1990 through 1995, over twenty-five million dollars in advertising; for 1995 alone, over five million dollars; and projected for 1996, over eleven million dollars. (Dores Decl. at ¶14.) Playtex has derived over two billion dollars in sales of tampons under the mark. (Dores Decl. at ¶15.)

First Quality, which manufactures and sells Femtex branded tampons, plans to introduce rounded-tip paper applicator tampons under the "Gentle Touch" mark. (Damaghi Decl. at ¶2.) A trademark search First Quality ordered prior to adopting the "Gentle Touch" mark revealed a number of registrations for "Gentle Touch" for a variety of goods other than tampons—from hair care products to furniture—as well as a number of registrations using the word "Touch" alone or in conjunction with another word. (*See* Ex. A to Damaghi Decl.) On 15 October 1996, First Quality filed an application with the United States Patent and Trademark Office to register the "Gentle Touch" mark for use with tampon paper applicators.

First Quality's "Gentle Touch" tampons apparently will be carried by retailers who

already sell Playtex's "Gentle Glide" products. (Dores Decl. at ¶ 18.) Tampons generally are an inexpensive product, with retail prices ranging from $2.99 to $4.50 for a box of twenty. Few boxes of any size sell for more than $6.00. (Dores Decl. at ¶ 7.)

## DISCUSSION

Preliminary injunctive relief is warranted when the moving party can establish both irreparable harm and either a likelihood of success on the merits or sufficient questions on the merits to "make them a fair ground for litigation and a balance of hardships tipping decidedly" in the movant's favor. *Warner–Lambert Co. v. Northside Dev. Corp.*, 86 F.3d 3, 6 (2d Cir.1996) (citation omitted).

The Lanham Act provides that an action for trademark infringement will lie where a person intends to use in commerce a colorable imitation of the registered mark of another without their consent and "such use is likely to cause confusion." 15 U.S.C. § 1114(1)(b). Thus, the critical issue in any trademark action is "whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *Universal City Studios, Inc. v. Nintendo Co., Ltd.*, 746 F.2d 112, 115 (2d Cir.1984) (quoting *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir.1978)).

Though likelihood of confusion has been found as a matter of law where there is great similarity of marks and close proximity of products, the propriety of injunctive relief may not turn on these factors alone. *Vitarroz Corp. v. Borden, Inc.*, 644 F.2d 960, 966 (2d Cir.1981). Rather, even where marks are similar and products proximate, each of a number of additional factors must be analyzed to determine likelihood of confusion. Those factors, which have come to be known as the *Polaroid* factors, are as follows: (1) strength of the senior mark; (2) degree of similarity between the two marks; (3) proximity of the products; (4) likelihood of bridging the gap; (5) actual confusion; (6) defendant's good faith in adopting its mark; (7) quality of defendant's product; and (8) buyer sophistication. *Polaroid Corp. v. Polarad Elecs Corp.*, 287 F.2d 492, 495 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). No factor is dispositive, "nor can the presence or absence of one determine ... the outcome of an infringement suit." *Lever Bros. Co. v. American Bakeries Co.*, 693 F.2d 251, 253 (2d Cir.1982).

### I. Strength of the Mark

A trademark's "strength" is assessed based upon its "tendency to identify the goods sold under the mark as emanating from a particular ... source." *Lever* Bros., 693 F.2d at 256 (citation omitted). Courts utilize several terms of art to define the spectrum of trademark strength: "arbitrary" marks, which employ common words in unfamiliar ways, are entitled to the greatest protection, *Lever Bros.*, 693 F.2d at 256; "suggestive" marks, which "require[ ] imagination, thought and perception to reach a conclusion as to the nature of the goods," *Id.* at 256 n. 7, are next on the spectrum; "descriptive" marks, which convey an "immediate idea" of the nature of the product, *Id.*, are next; and "generic" marks, which have come to define an entire product category, *Id.*, fall a distant last on the strength spectrum. Though "an amorphous concept," trademark strength can be analyzed best in the commercial context in which the products at issue compete. *See Id.* at 257 (citing *McGregor–Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1133 (2d Cir.1979)).

■ The Court finds that Playtex's "Gentle Glide" mark is suggestive, and therefore a fairly strong mark entitled to substantial protection. Divorcing the mark from its product, "Gentle Glide" does not connote or describe tampons; imagination is required to make the connection. Though the mark may describe attributes Playtex would have the public ascribe to its tampons—that they are indeed gentle to use and easy to insert—it is not descriptive of the substance of the product itself. First Quality's contention that the mark has no strength independent of the Playtex name is meritless.

The finding that "Gentle Glide" is a strong mark entitled to substantial protection is bolstered by its history. Significant advertising

expenditures, long and exclusive use, and substantial sales success all support an inference that a mark has acquired "secondary meaning" in the eyes of the buying public. *See Centaur Communications v. A/S/M Communications,* 830 F.2d 1217, 1222 (2d Cir.1987). Playtex has employed the "Gentle Glide" mark continuously for the nearly twenty-four years since it coined the mark in 1973. Playtex has spent in excess of twenty-five million dollars in advertising for "Gentle Glide" tampons over the last five years, and has derived over two billion dollars in sales over the life of the product. Such facts support the inference that "Gentle Glide" is a strong mark with powerful " 'origin-indicating' quality[ ] in the eyes of the purchasing public." *Lever Bros.,* 693 F.2d at 256 (citation omitted).

First Quality argues that the strength of the "Gentle Glide" mark is diminished by the *number of third party registrations* revealed in its trademark search. Though a mark's distinctiveness may be diluted by third party use, *Lever Bros,* 693 F.2d at 256, First Quality has submitted no evidence to support the claim that the "Gentle Glide" mark's distinctiveness *in fact* has been diluted by third party use of similar marks on other, unrelated products. Use of the mark "Gentle Touch" on "sanitary napkins" might offer some support for First Quality's thesis, but that use was abandoned 10 December 1984 after a 7 February 1983 filing. (*See* Trademark Search Report attached to Damaghi Decl. at 6.) Use of "Gentle Touch" on products as disparate as "natural wood pellets for use as animal bedding," (*Id.* at 14), and "video tapes for teaching infant massage," (*Id.* at

23), cannot, without more, be deemed to dilute the distinctiveness of Playtex's mark.

## II. Degree of Similarity Between the Two Marks

 Degree of similarity turns on the "general impression" conveyed to prospective purchasers by each mark. *C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc.,* 753 F.2d 14, 18 (2d Cir.1985); *see Lever Bros.,* 693 F.2d at 257. Among the features likely to have an impact on the impulses and memories of the buying public are size, layout, design, and logotype of the two titles, *C.L.A.S.S. Promotions,* 753 F.2d at 18, as well as overall packaging context. *Lever Bros,,* 693 F.2d at 257. Proximity of a mark to the "primary" mark of a company name may not be relied upon to distinguish two otherwise similar marks.[1] *Burton–Dixie Corp. v. Restonic Corp.,* 43 C.C.P.A. 950, 234 F.2d 668, 669–70 (C.C.P.A.1956) (concluding that "necessary" assumption that mark will continue to be used in conjunction with primary mark "could be justified only if each party had no legal right to use his registered mark by itself").

 Comparison of the overall packaging of the products reveals that, though far from identical, the packages bear significant similarities.[2] The overall box shape and size appear to be quite similar, an appearance no doubt dictated by the comparable shape, size, and number of the tampons contained in each. The "Gentle Touch" box also adopts entirely the dominant purplish color comprising the background of the Playtex logo; the same color dominates the "Gentle Glide" box despite the fact that the remainder of the box is light blue and white. Though the iconog-

---

**1.** The Second Circuit's decision in *Thompson Medical Co. v. Pfizer, Inc.,* 753 F.2d 208, 218 (2d Cir.1984), suggests that "secondary" marks should be considered in conjunction with "primary" marks such as marks denoting an entire product line. It would be inappropriate to adopt that suggestion in this case at this stage. First, as in *Burton–Dixie,* at least one of the primary marks at issue is a company name (here Playtex) which independently denotes no particular product. Furthermore, First Quality "Gentle Touch" tampons may not only appear under the brand name Femtex, (*see* Pl.'s Ex. 1), but may even be sold as a "private label product" and appear on the market under other brand names. (*See*

Dores Decl. at ¶ 18.) Second, neither party has submitted any evidence as to whether "Gentle Glide" should be considered a "primary" or "secondary" mark; ruling on that issue at this preliminary stage, absent further factual development, would be rash.

**2.** The "degree of similarity" analysis is based upon comparison of an actual box of "Gentle Glide" tampons, (*see* Pl.'s Ex. 3), and an advertisement depicting a box of "Gentle Touch" tampons. (*See* Pl.'s Ex. 1.) The difficulty of comparing a physical object to a photograph renders the analysis somewhat approximate.

raphy of the two marks is similar in that both are written with the same forward slant, the "Gentle Touch" mark is more scripted and angles upwards across the face of the box rather than straight across the center. Also, the words "Gentle Touch" are stacked rather than consecutive as on the "Gentle Glide" mark. A final, and perhaps telling, similarity is the swipe of darker purple across the upper right hand corner of the "First Quality" box, which closely mirrors the purple "Protection Plus" banner that appears below the "Gentle Glide" mark.

■ "In order to determine if confusion is likely, each trademark must be compared in its entirety; juxtaposing fragments of each mark does not demonstrate whether the marks as a whole are confusingly similar." *Universal City Studios,* 746 F.2d at 117. *See Perfect Fit Industries, Inc. v. Acme Quilting Co.,* 618 F.2d 950, 954 (2d Cir.1980) ("[T]he 'combination of features as a whole rather than a difference in some of the details which must determine whether the competing product is likely to cause confusion in the minds of the public.' ") (citation omitted). Two caveats condition the foregoing principle: First, marks whose similarity results from the use of similar words that are in the public domain are deemed less likely to cause consumer confusion. *J.R. Wood & Sons, Inc. v. Reese Jewelry Corp.,* 278 F.2d 157, 159 (2d Cir.1960). Second, descriptive words, "which ha[ve] little trademark significance will not be regarded as the dominant part of the mark." *Burton–Dixie,* 234 F.2d at 671. Despite these conditioning principles, however, likelihood of confusion may be found even when marks contain public domain or descriptive words. *See I.T.S. Industria Tessuti Speciali v. Aerfab Corp.,* 280 F.Supp. 581, 589 (S.D.N.Y.1967).

The Court is not persuaded, at this preliminary stage, by First Quality's strenuous arguments that the term "Gentle" is merely descriptive and can provide no basis for a finding of confusing similarity. As discussed at Part I, *supra,* the Court finds that "Gentle" is more suggestive than descriptive, in that imagination is required for the term to identify the product; though it may be a sought after attribute, "Gentle" alone in no

way connotes "tampon." Nor is "Glide" a public domain or descriptive term in reference to the product. Accounting also for the similarities in design and packaging discussed above, the Court finds that the two marks as a whole evince a significant degree of similarity.

### III. Proximity and Quality of Defendant's Product

■ Product proximity turns on the nature of the products at issue and the structure of the relevant market. *Vitarroz Corp.,* 644 F.2d at 967. Here, First Quality does not contest Playtex's assertion that "Gentle Touch" tampons "will be carried by many of the same retailers who also now carry Playtex's GENTLE GLIDE tampons." (Dores Decl. at ¶ 18.) Furthermore, the parties agree that, practically, the products are identical and likely to be of nearly identical quality. Thus, the products are closely proximate.

### IV. Likelihood of Bridging the Gap

The parties agree that, because the products directly compete, there is no gap to be bridged.

### V. Actual Confusion

The parties agree that, because "Gentle Touch" tampons have yet to be introduced to market, there is no evidence of actual confusion.

### VI. Defendant's Good Faith in Adopting its Mark

■ Adoption of a mark with the intention of capitalizing on the reputation and good will of another may support a "presumption that a second comer intended to create a confusing similarity." *See Centaur Communications,* 830 F.2d at 1228. The fact that a defendant adopted a designation with full knowledge of a plaintiff's mark further supports that inference. *See Friedman v. Sealy, Inc.,* 274 F.2d 255, 260 (10th Cir.1960). Nonetheless, courts "must be careful to consider the distinction between 'a deliberate attempt to deceive and a deliberate attempt

to compete.'" *Industria Tessuti,* 280 F.Supp. at 589.

█ The similarity of the two marks, the packaging similarities discussed above, and the fact that its trademark search provided First Quality actual knowledge of the "Gentle Glide" mark before it adopted "Gentle Touch" all support, at minimum, a weak inference that First Quality adopted the "Gentle Touch" mark with the intent to capitalize on Playtex's reputation and good will.

*VII. Buyer Sophistication*

█ Generally, a lower price indicates that "the normal buyer will exercise relatively less caution, making confusion more likely." *Lever Bros. Co. v. American Bakeries Co., Inc.,* 537 F.Supp. 248, 255 (E.D.N.Y. 1982). This long-established proposition is grounded in common sense; purchasers are more likely to exercise a greater degree of "careful consideration" when larger sums are at stake. *Magnaflux Corp. v. Sonoflux Corp.,* 43 C.C.P.A. 868, 231 F.2d 669, 671 (C.C.P.A.1956). Thus, while the purchaser of a diamond ring is likely to be "most discriminating ... careful[ ] and deliberate[ ]," *Reese Jewelry,* 278 F.2d at 159, buyers of bread and butter items will be more casual. *Lever Bros.,* 693 F.2d at 259.

The low price point at which tampons are sold supports an inference that buyers will exercise relatively little care when choosing products from the shelf. However, the highly personal nature of the product may offset somewhat the conventional wisdom on this factor of the *Polaroid* analysis.

### CONCLUSION

█ Based on the foregoing analysis of the marks and products at issue under the *Polaroid* framework, the Court must conclude that there is a sufficient question on the merits to "make them a fair ground for litigation" and a balance of hardships tipping in Playtex's favor. *Warner–Lambert,* 86 F.3d at 6.

"Gentle Glide" is a suggestive mark whose over twenty years in the marketplace and two billion dollars in sales are indicative of its substantial strength. In addition to signifi-

cant similarities in packaging, "Gentle Glide" and "Gentle Touch," each taken as a whole, are syntactically similar and evoke similar product attributes. The products themselves are nearly identical, directly competitive, and sold in a comparable manner in comparable markets. First Quality adopted the "Gentle Touch" mark with actual knowledge of Playtex's long-running use of the "Gentle Glide" mark, and it would seem that the relevant consumers may not carefully differentiate between the two products. Moreover, the likelihood of consumer confusion is sufficient to support the conclusion that Playtex will be irreparably harmed by the introduction of "Gentle Touch" tampons into the market. *See Home Box Office, Inc. v. Showtime/The Movie Channel Inc.,* 832 F.2d 1311, 1314 (2d Cir.1987).

For all the foregoing reasons, Playtex's application for a preliminary injunction must be, and the same hereby is, GRANTED. Playtex is directed to post a bond in the amount of $100,000.00 dollars, and to submit proof thereof to the Clerk of the Court within fourteen days of the date of this Memorandum and Order, as security for the payment of such costs and damages as may be incurred or suffered by First Quality should they be found to have been wrongfully enjoined. See Fed.R.Civ.P. 65(c).

SO ORDERED.