William RAY, Plaintiff–Appellant,

v.

PEABODY INSTITUTE OF The JOHNS HOPKINS UNIVERSITY CONSERVATORY OF MUSIC, Defendant–Appellee.

No. 93–1361.

United States Court of Appeals, Fourth Circuit.

Argued Sept. 29, 1993.

Decided Dec. 1, 1993.

---

**32**

Squire Padgett, Washington, DC, argued (David L. Rose, Debra Palmer–Henry, Washington, DC, Isaac Joe, Baltimore, MD, on brief), for plaintiff-appellant.

Frederick G. Savage, the Johns Hopkins University, Baltimore, MD, argued (Eileen S. Goldgeier, the Johns Hopkins University, Baltimore, MD, on brief), for defendant-appellee.

Before WILKINSON, LUTTIG, and WILLIAMS, Circuit Judges.

## OPINION

LUTTIG, Circuit Judge:

William Ray appeals from a district court order granting summary judgment to the Peabody Institute of the Johns Hopkins University on his claims that several personnel actions taken against him by Peabody violated Title VII of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act of 1967. For the reasons that follow, we affirm.

### I.

William Ray, a sixty-seven year old black man, has been a voice instructor since 1982 at the Peabody Conservatory, a music college affiliated with the Johns Hopkins University. Ray was hired as a "performance" or "studio" faculty member in Peabody's voice department to train students to be professional performers.

In an effort to attract students to the conservatory, Peabody assigns matriculating students to the studio of their first or second choice, provided that studio is not full and the faculty member is willing to instruct them. The students generally remain in the studio to which they are initially assigned throughout their study at the Institute. Students who do not register a preference for a particular studio, or whose preferred studios are unavailable, are permitted to choose from among the remaining available faculty studios. J.A. at 109–111.

Since arriving at Peabody, Ray has consistently failed to attract a full class of fourteen students to his studio. *Id.* at 112. Notwithstanding the facts that prior to and since Ray's arrival, Peabody's faculty salaries have been based in part on studio enrollment, *id.* at 117, and that Ray's studio was significantly under-enrolled, Peabody paid Ray his full salary during each of his first three years at the conservatory, *id.* at 115, 118, in addition to the five-thousand dollars annually that he was paid to serve as Peabody's minority recruiter. *Id.* at 25, 170. In May 1985, however, Dean Eileen Tate Cline, a black woman, informed Ray that his salary would thereafter be adjusted to account for the under-enrollment in his studio (although in fact Ray's salary for the following year was still not reduced to reflect his sub-par enrollment). *Id.* at 88–89. After enrolling twelve students in 1985–86, two fewer than the full enrollment of fourteen, Ray's studio attendance dwindled to ten students in 1986–87, seven in 1987–88, and six in 1988–89. *Id.* at 112. Based in large part on Ray's undersubscribed studio, Dean Cline finally recommended that Ray's contract not be renewed

effective July 1, 1989. This recommendation was ultimately rejected after intercession by the University provost, however, and Ray's contract was renewed for the 1989–90 academic year. *Id.* at 115–16.

During that year, a specially convened state task force mandated that Peabody control its expenditures. *Id.* at 118. In response, Peabody adopted new faculty salary guidelines that tied compensation even more directly to an instructor's studio enrollment.[1] *Id.* at 119, 134. These guidelines have been uniformly applied to all instructors at Peabody since 1990. As Ray's studio enrollment between 1990 and 1993 dwindled from seven students to four and then to only one, *id.* at 112, Peabody applied its new guidelines, with some lenience,[2] to reduce his salary by five percent, then by fifty percent, and finally to convert Ray to a part-time faculty member paid on an hourly basis. *Id.* at 121. The salaries of twelve other instructors were also reduced under these guidelines.

Ray alleges that his salary adjustments were made on the basis of his race and age in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, and the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 621 *et seq.* The district court held that Ray failed to establish a *prima facie* case of discrimination, and granted summary judgment to Peabody. From this judgment, appeal was taken.

## II.

Ray advances essentially two theories of discrimination. First, he contends that Peabody's enrollment-based salary plan is itself discriminatory because it impermissibly allows subjective student preferences to dictate faculty salaries. Second, he argues that, even if Peabody's enrollment-based compensation plan is not discriminatory in principle, Peabody discriminatorily manipulated its student assignment system to minimize the number of students enrolled in his studio. We reject both claims.

### A.

 Ray first challenges the legality of Peabody's compensation scheme itself. He alleges that, because faculty salaries are directly affected by the students' studio choices, which are often made after actually meeting various instructors, the scheme is "inherently designed to reflect the subjective preferences and prejudices of individual students...." Appellant's Brief at 36. In effect, he argues that the compensation plan, although facially neutral, disparately affects minorities and the aged.

We find it difficult to imagine a case where a plaintiff could successfully claim that a policy of allowing students to choose their instructors, a neutral educational policy with an established tradition in higher education, and basing salary in part on the resulting enrollment, violates Title VII. Assuming that such would be possible, however, it is clear that Ray has not produced the evidence that would be required to make out this claim. As the district court recognized, Ray produced "no evidence" contradictory to Peabody's assertions that the 1990 guidelines have been uniformly applied to all faculty members and have resulted in salary reductions for faculty members of diverse races and ages. J.A. at 31–32. Indeed, the record

---

1. The guidelines outline a four-step formula for calculating salaries:

 (1) for faculty members with less than a full complement of studio enrollments for one year, no raise is granted;
 (2) if the faculty member fails to maintain a full studio for two consecutive years, the salary is reduced by 5%;
 (3) if the faculty member has less than a full complement three years in a row, the salary is reduced to reflect the percentage of a full studio actually enrolled;
 (4) if the problem of under-enrollment persists for four straight years, the faculty member is converted from full-time to parttime status, and is paid per student on an hourly basis, losing the fringe benefits made available to full-time faculty, including life and medical insurance.

2. Peabody represents that the new guidelines were actually applied leniently to five faculty members, three because they had not had prior notice of their under-enrollment problems, one because he had taught at Peabody for twenty-seven years and had recently suffered a catastrophic family medical crisis, and Ray. J.A. at 120.

supports no conclusion other than that Peabody's compensation scheme is a sound educational policy born not of racial design, but of a genuine interest in achieving the highest academic standards possible during a period of financial austerity. Against this record, the mere fact that the plan happened to affect adversely one member of a protected class through its even-handed infusion of healthy competition into the salary calculus simply is not sufficient to permit Ray to withstand a motion for summary judgment. *Cf. Gairola v. Commonwealth of Virginia Dep't of General Services,* 753 F.2d 1281, 1287 (4th Cir.1985) (Title VII does not "require an employer to adopt a life of economic altruism and thereby immunize protected class members from discharge or demotion despite their poor performance . . .").

### B.

■ Perhaps recognizing as much, Ray alternatively contends that, even if Peabody's salary plan is not itself illegitimate, the institution still violated Title VII by manipulating its student assignment system so as to minimize Ray's studio enrollment and thereby reduce his compensation. Ray claims in this regard that Peabody deliberately assigned a disproportionate number of minority students to his studio. These assignments resulted in under-enrollment, he alleges, because minority students "scared off" non-minority students and were themselves more likely to drop out of the program.[3]

Like Ray's disparate impact claim, this claim of discriminatory manipulation of Peabody's student assignment system is both factually unsupported and legally flawed. Ray has no evidence whatsoever to support his insistent allegations that a disproportionate number of minorities were deliberately assigned to his studio by the administration, as is illustrated by his concessions that he "ha[s] no idea" which of his students were assigned to him and which actually selected his studio, *id.* at 924; *id.* at 904–08, 1023.

*See Reed v. Amax Coal Co.,* 971 F.2d 1295, 1299 (7th Cir.1992) (Title VII plaintiff cannot make showing of *prima facie* case of discrimination adequate to survive summary judgment through bare allegations, but must present admissible evidence). The mere fact that Ray's studio typically comprised a disproportionate number of minority students does not itself give rise to an inference that the administration actually assigned those students to Ray's studio. In fact, if any inference is possible from the evidence of record, it is that a disproportionate number of minority students *chose* Ray as their studio instructor: Ray himself admits that, as a specially compensated minority recruiter, he personally recruited many of the minority students in his studio, *id.* at 906–07, and, according to at least one of his students, he "took a special interest in African American and other minority students." *Id.* at 256–57.

Even assuming that the disproportionate number of minority students in Ray's studio was the result of assignments by the Institute, the record before us does not support Ray's counter-intuitive allegation that assigning students to his studio adversely affected him. *See id.* at 34. Rather than permitting an inference of discrimination, the record instead reveals that any assignments of students to Ray's studio were, if anything, well-intentioned efforts to bolster his flagging studio enrollment by those concerned for his professional reputation. *See id.* at 112, 124–25, 544–45. Although these efforts were often ultimately unsuccessful because students assigned by the administration to Ray's studio frequently refused to matriculate at Peabody, or requested a transfer to another studio, *id.* at 114, 545, that the efforts were made confirms, as Dean Cline testified, that Ray was in fact treated *more* favorably because of his race:

> [A]s the only African–American Dean of a major national conservatory, I have always gone out of my way to try to see Mr. Ray succeed at the Peabody Conservatory. It

---

**3.** Ray also alleges that other Peabody instructors criticized his teaching abilities and that Peabody assigned more students to the studios of three part-time faculty members hired in 1991 than to his studio. As the district court found, however, both of these claims are without merit. *See Ray v. Peabody Institute of Johns Hopkins University, Conservatory of Music,* No. 92–CV–918 at 10–14, 1993 WL 56789 (D.Md. Feb. 19, 1993).

has been only with the greatest heartfelt disappointment that I have observed Mr. Ray to be unsuccessful in his attraction of adequate numbers of students to justify the continuation of the payment of his salary he was earning prior to 1990. I have attempted to assist him in numerous ways. For the February, 1991 auditions, in every case in which Mr. Ray was the only current faculty member who agreed to teach a given student, that student was assigned to Mr. Ray and was not given a choice of any of the new teachers.

In addition, in an effort to assist Mr. Ray to fill his studio, the Conservatory made it possible for him to accept students into his studio who otherwise would not have been admitted to the School. Peabody made an extra effort to encourage and support Mr. Ray and his students, including congratulatory letters from the Director, efforts to publicize his and his students' successes, and extra financial support for his students.

*Id.* at 124.

### III.

The record before us unequivocally reveals, as the district court found, that Ray's salary reduction was not the result of discrimination, but rather was the foreseeable consequence of implementing Peabody's enrollment-based compensation plan, an entirely legitimate effort to constrain costs by rewarding competence. Through the vehicle of Title VII, Ray has attempted to shift to Peabody the blame for his own relative inability, which was exposed through the Institute's renewed emphasis on quality education. The district court properly refused complicity in such a misappropriation of Title VII. Accordingly, its judgment is affirmed.

*AFFIRMED.*