**AZTAR CORPORATION, Plaintiff,**

v.

**NY ENTERTAINMENT, LLC, d.b.a. Big Apple Casino Cruises, Jubilee of the Bahamas, Inc., a Bahamian Corporation, and Fred Collins, Jr., Defendants.**

No. 97–CV–3674.

United States District Court, E.D. New York.

July 29, 1998.

Albert Robin, Robin, Blecker, Daley & Driscoll, New York, NY, W. Mack Webner, Sughrue, Mion, Zinn, Macpeak & Seas, Washington, DC, for Plaintiff.

Salem M. Katsh, Shearman & Sterling, Edward G. Williams, Holland & Knight, LLP, New York, NY, for Defendant.

*MEMORANDUM AND ORDER*

GLASSER, District Judge.

Plaintiff Aztar Corporation ("Aztar"), the owner of two federal trademark registrations for the name TROPICANA for, *inter alia,* casino services, brought this trademark infringement and dilution action against defendants N.Y. Entertainment, LLC, d.b.a. Big Apple Casino Cruises and Jubilee of the Bahamas, Inc., the owners and operators of the M/V Tropicana—a cruise ship offering casino services—and Fred Collins, Jr. ("Collins"), a principal of those entities. Aztar has now moved for summary judgment and defendants have cross-moved to dismiss. For the following reasons, plaintiff's motion is granted and defendants' motion is denied.

### FACTS

Aztar holds two registered trademarks for the name TROPICANA for hotel, restaurant, casino and entertainment services. Pl. 56.1, ¶ 1; Def. 56.1, ¶ 1. It has used the trade name and service mark TROPICANA since 1989 and claims use of that mark to identify casinos, through predecessors in interest and title, since 1957. Pl. 56.1, ¶ 2; Def. 56.1, ¶ 2.[1] Aztar currently owns and operates TROPICANA casinos resorts in Atlantic City and Las Vegas. Pl. 56.1, ¶ 3; Def. 56.1, ¶ 3. Both casinos have been in existence for substantial periods of time and generate substantial revenues. Pl. 56.1, ¶¶ 4–7, 10; Def. 56.1, ¶¶ 4–7, 10. In addition, both casinos feature the name TROPICANA in bold letters on the buildings. Pl. 56.1, ¶ 8; Def. 56.1, ¶ 8.

Aztar also owns two river boat casinos. Because neither casino is large enough or offers enough services, Aztar has not used the name TROPICANA in conjunction with them. It does not, however, "rule out the future use of TROPICANA for a river boat

of sufficient grandeur." Pl. 56.1, ¶¶ 10–11; Def. 56.1, ¶¶ 10–11.

In 1989, Aztar learned of a casino cruise ship named the M/V TROPICANA that operated out of Florida ports. Its lawyers thereupon wrote cease and desist letters to the ship's owners[2] demanding that they cease using the name TROPICANA. Pl. 56.1, ¶ 12; Def. 56.1, ¶ 12. Aztar did not receive a response to these letters, but shortly thereafter the owners ceased operating the ship as the M/V TROPICANA; the ship then began to be operated as the Saint Lucie. Pl. 56.1, ¶¶ 13–14; Def. 56.1, ¶¶ 13–14.

Collins purchased the Saint Lucie in May, 1994, repaired and refitted it, changed its name back to M/V TROPICANA and began to operate it in February 1995 out of Miami through his companies, Jubilee of the Bahamas, Tropicana Cruises International, Inc. and Tropicana Cruises USA, Inc. Pl. 56.1, ¶¶ 15–16; Def. 56.1, ¶ 15–16. Defendants' intention—the "purpose of the ship"—was to provide "Las Vegas style and type entertainment" through a "gambling cruise." Pl. 56.1, ¶ 19; Def. 56.1, ¶ 19. TROPICANA cruises operated out of Miami for two seasons—1995 and 1996—and then moved to New York in the Spring of 1997. Pl. 56.1, ¶ 21; Def. 56.1, ¶ 21. According to defendants, the M/V TROPICANA had undergone certain changes prior to the commencement of this lawsuit "to reflect the fact that the casino portion of the ship would operate in New York City as the 'Big Apple Casino'"; in addition, defendants aver that "[t]he name Tropicana Casino Cruises was not to be used." Def. 56.1, ¶ 20.

Plaintiff claims that certain of its vendors read of the M/V TROPICANA in June 1997 or saw it on a television program and believed it to be associated with the Aztar

---

1. Defendants "Response to Plaintiff's Rule 56.1 Statement" admits that Aztar currently uses the mark, but notes that it called its Atlantic City property TROP WORLD from 1988 until 1996. Def. 56.1, ¶ 2.

Defendants' 56.1 Statement is replete with responses of "lack knowledge or information sufficient to either admit or deny." Defendants have not created any issues of fact through this artifice. Under Local Rule 56.1, "[a]ll material facts

set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party." *See Toyomenko Pacific Petroleum, Inc. v. Hess Oil Virgin Islands Corp.,* 771 F.Supp. 63, 67 (S.D.N.Y.1991).

2. This occurred before Collins purchased the ship. Def. 56.1, ¶ 12; Collins Decl., ¶ 4.

property in Atlantic City. Pl. 56.1, ¶ 21.[3] In addition, Aztar has conducted a consumer survey which, it claims, demonstrates consumer confusion. Pl. 56.1, ¶ 22.

In March 1995, Tropicana Cruises International filed an application to register the service mark TROPICANA for "cruise ship services." Pl. 56.1, ¶ 23; Def. 56.1, ¶ 23. However, in an Office Action dated September 6, 1995 (the "Office Action"), the United States Trademark Office rejected the application, citing the prior registration of TROPICANA by Aztar and noting that registration of the TROPICANA name for cruise ship services would create a likelihood of confusion. Pl. 56.1, ¶ 24; Def. 56.1, ¶ 24. Plaintiffs claim that "Collins and his General Counsel were on notice from that date forward that the name TROPICANA CRUISES for gaming cruise services was likely to cause confusion." Pl. 56.1, ¶ 24; Pl. 56.1, Ex. 15. Defendants dispute this point, noting that its General Counsel had not yet been employed by them. Def. 56.1, ¶ 24.

When Aztar learned of the application, its attorneys wrote a cease and desist letter to Tropicana Cruises International. The letter was answered by Timothy Youmans, defendants' General Counsel, who stated, in pertinent part, as follows:

This letter will serve as confirmation that TROPICANA CRUISES does not intend to use the Service Mark "Tropicana" in connection with any hotel, restaurant or casino services.

Tropicana Cruises operates out of the Port of Miami and is operational as a cruise line. The M/V Tropicana does offer restaurants and casinos for the entertainment and enjoyment of her passengers. However, neither of these services operate under the trade name "Tropicana".

Pl. 56.1, ¶ 25; Def. 56.1, ¶ 25.

At the July 3, 1997 hearing on Aztar's motion for a temporary restraining order, defendants' General Manager testified that

the ship is owned by Fred Collins and it has been named "Tropicana Cruise Lines" for the last five years down in the Miami

area. We actually came here to operate under the name "Big Apple Casino," not "Tropicana." That's just the name of the ship itself.

Pl. 56.1, ¶ 28, Ex. 17; Def. 56.1, ¶ 28. Later, at a July 14, 1997 hearing, defendants' General Manager testified as follows:

BY THE COURT:

Q: Did you tell this court that this ship was not going to be operating as the Tropicana Cruise Casino but as the Big Apple Cruise Casino?

A: Yes, I did.

Q: Is this ship going to be operating as the Tropicana Casino Cruise ship or the Big Apple Casino Cruise ship?

A: The Big Apple.

Mr. Webner: Have you changed the name? Have you painted over the Tropicana Cruise Line.

The Witness: Yes. As a matter of fact it has been. Big Apple was painted on the side of it and that's how we've answered the phone for the last three weeks or so.

Pl. 56.1, Ex. 16; Def. 56.1, ¶ 29. As a consequence of this testimony, Aztar withdrew its motion for a preliminary injunction. Pl. 56.1, Ex. 16. Defendants explain that their General Manager was answering these questions to the "best of his ability" and that

the name "Tropicana Cruise Line" had never appeared on the ship. The name "Tropicana Casino Cruises" was painted on the bridge and [the General Manager] was correct that the name was painted over and replaced with the words "Big Apple Casino."

Def. 56.1, ¶ 29.

Subsequent to the July 14, 1997 hearing, defendants issued a press release and ran an advertisement in the *New York Daily News* Fall Casino Guide Section featuring a picture of the ship with the name TROPICANA clearly displayed. Pl. 56.1, ¶ 35; Def. 56 .1, ¶ 35; Pl. 56.1, Exs. 15–16 to Ex. 7.

The name of the ship continues to be M/V TROPICANA and the word TROPICANA appears on either side of the ship (in twenty

---

**3.** Defendants do not deny this statement, but argue that any vendor comments are irrelevant because they do not concern *consumer* confusion and are, in any event, hearsay. Def. 56.1, ¶ 21.

foot high letters) as well as on the prow and stern of the ship (the latter in large green letters) and on a sign on either side of and above the bridge. In one place—the bridge—the name was changed from TROPICANA CASINO CRUISES to BIG APPLE CASINO. Pl. 56.1, ¶ 31; Def. 56.1, ¶ 31.

Defendants have been denied a liquor license by the State of New York and have never applied to New York City for a license to operate a gambling cruise ship out of New York. They have put the ship up for sale. Pl. 56.1, ¶¶ 32–34; Def. 56.1, ¶¶ 32–34.

Collins has been in the gaming business for more than forty years, since he was a teenager. He has been called the "King of Video Poker" and he regularly travels to Las Vegas. Collins recognized Aztar's prior use of the TROPICANA name. Pl. 56.1, ¶¶ 37–40; Def. 56.1, ¶¶ 37–40.

### DISCUSSION[4]

*Summary Judgment*

#### A. *Standard for Summary Judgment*

■ Summary judgment under Rule 56 is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party bears the burden of proof on such a motion. *United States v. All Funds,* 832 F.Supp. 542, 550–51 (E.D.N.Y.1993).

If the summary judgment movant satisfies its initial burden of production, the burden of proof shifts to the nonmovant who must demonstrate that a genuine issue of fact exists for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d

202 (1986). A genuine factual issue exists if there is sufficient evidence favoring the nonmovant such that a jury could return a verdict in its favor. *Id.* The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. Once the nonmovant has adduced evidence of a genuine issue of material fact, its "allegations [will be] taken as true, and [it] will receive the benefit of the doubt when [its] assertions conflict with those of the movant." *Samuels v. J. Mockry, et al.,* 77 F.3d 34, 36 (2d Cir.1996).

#### B. *Trademark Infringement/Polaroid Factors*

■ To determine whether defendants have infringed plaintiff's trademarks both sides have referred to the seven non-exhaustive factors considered by the United States Court of Appeals for the Second Circuit in *Polaroid Corp. v. Polarad Electronics Corp.,* 287 F.2d 492 (2d Cir.1961):

> the strength of [the] mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product and the sophistication of the buyers.

*Id.* at 495. These factors are considered in turn below.

4. Defendants' cross-motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(1), 12(c) and 56 is not dealt with at length below. Although defendants do not currently have authorization to commence operations out of New York Harbor, and have placed their ship on sale, Pl. 56.1, ¶¶ 33–34, Def. 56.1, ¶¶ 33–34, plaintiffs are correct that discontinuance of the allegedly infringing act does not render an action for injunctive relief moot where the alleged infringer continues to assert a right to engage in the complained-of conduct. *See, e.g., Blisscraft of Hollywood v. United Plastics Co.,* 294 F.2d 694, 702 (2d Cir.1961); *Pinaud, Inc. v. Huebschman,* 27 F.2d 531, 537 (E.D.N.Y.1928), *aff'd,* 27 F.2d 538 (2d Cir.1928). *See also* J. McCarthy, 4 *McCarthy on Trademarks and Unfair Competition* § 30.11 ("[e]ven if the defendant has ceased wrongful activities, an injunction should be granted where defendant's intentions are in doubt").

## 1. *Strength of the Marks*

Plaintiff argues that as an arbitrary mark, TROPICANA is exceedingly strong. In addition, plaintiff notes that "Aztar and its predecessors in interest and title have used the mark TROPICANA for forty years" and that it "is the subject of two incontestable federal registrations." Pl. Mem. at 11.

 In general, an arbitrary mark[5]— which TROPICANA indisputably is—"will almost always be seen as [a] strong mark[ ]." *The Sports Authority, Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 961 (2d Cir.1996). Nevertheless, defendants contend that TROPICANA is a weak mark because it is widely used in various business arenas, including hotels and entertainment services. Def. Mem. at 17. It is therefore, according to defendants, entitled to protection only where it is identically used. *Id.* at 17–18.

To buttress their argument, defendants have submitted a trademark search and a search of businesses using the name TROPICANA. Williams Decl., Exs. A,B. The trademark search reveals 83 applications for marks containing the word "Tropicana" while the business search reveals 250 businesses that use the word as part of their name. With respect to the trademark search, many of the applications are listed as having been abandoned or as currently pending. The others are for unrelated uses, particularly in the food industry. None is for a casino or gambling use. With respect to the business search, although several motels and entertainment services use the name Tropicana, no casino or gambling business—other than the Aztar businesses—does.

In *Lever Bros. Co. v. American Bakeries Co.*, 693 F.2d 251, 256 (2d Cir.1982), the manufacturer of a margarine bearing the registered mark "AUTUMN" brought a trademark infringement action against the manufacturer of a whole-grain bread named "AUTUMN GRAIN." After a bench trial, the district court concluded that the plaintiff had not demonstrated a likelihood of confusion. The Second Circuit affirmed this conclusion, noting the presence of several other food products using the word "AUTUMN" as part of their names. 693 F.2d at 256. As the court remarked, "although denominating a mark 'arbitrary' can be useful in focusing the inquiry, the strength of a mark 'depends ultimately on its distinctiveness, or its 'origin-indicating' quality, in the eyes of the purchasing public.'" *Id.* (quoting *McGregor–Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1131 (2d Cir.1979)). Furthermore, "[j]ust as an invented, even bizarre term can lose a measure of trademark protection if it has become merely descriptive of the product [citations omitted], so too can the distinctiveness of an arbitrary mark be diluted by third party use [citations omitted]." *Id.* See also *Columbia University v. Columbia/HCA Healthcare Corp.*, 964 F.Supp. 733, 744–45 (S.D.N.Y.1997)(after defendants presented substantial evidence of third party use of the name Columbia in a variety of businesses—including hospitals and institutions—court found that it is not a strong mark in the medical or healthcare field).

Of course, where the third-party usage occurs in a completely unrelated field, it may have little bearing on the determination of the likelihood of confusion. *See, e.g., Playtex Products, Inc. v. First Quality Hygienic, Inc.*, 965 F.Supp. 339, 342 (E.D.N.Y. 1996)("Use of 'Gentle Touch' on products as disparate as 'natural wood pellets for use as animal bedding,' and 'video tapes for teaching infant massage,' cannot, without more, be deemed to dilute the distinctiveness of Playtex's mark.").

Plaintiff admits to third-party use of the name TROPICANA in bars and motels, Pl. Mem. at 12, but contends that such usage is irrelevant because it is not in the casino industry. Although bars and motels are not as different from casinos as "natural wood pellets for use as animal bedding" are from the tampons at issue in *Playtex*, 965 F.Supp. at 342, the products are nevertheless distinct. Although this factor presents somewhat of a close question, it favors plaintiff.

---

**5.** "An arbitrary term is one that has a dictionary meaning—though not describing the product—like IVORY for soap." *Gruner + Jahr USA Pub. v. Meredith Corp.*, 991 F.2d 1072, 1075–76 (2d Cir.1993). According to the *Oxford English Dictionary* (2d ed.), "tropicana" refers to "[t]hings associated with or characteristic of tropical regions; objects from the tropics."

## 2. Degree of Similarity between the Two Marks

█ Aztar contends that the marks are identical, that both parties use the word TROPICANA in plain letters, in print and throughout their advertising and promotional materials. Defendants contend that the marks are different, in that Aztar—as can be observed on its website, Williams Decl., Ex. C—uses the name TROPICANA "in gold letters, in a raised, uppercase font with a gold-rimmed, dark-blue diamond in the background, and a designation of the Atlantic City or Las Vegas location of the casino over the word Tropicana" while they use the name "in large green block letters, in a plain font, and with a white background." Def. Mem. at 18. Although defendants are correct in their assertion that differences in typeface, font and general presentation may lead to a finding that two marks are substantially different in use, see, e.g., Grotrian, Helfferich, Schulz, Etc. v. Steinway & Sons, 523 F.2d 1331, 1339 (2d Cir.1975)(differences in typefaces "serve[ ] to distinguish the marks visually"), the materials submitted by plaintiff reveal that Aztar uses its mark in a variety of typefaces, fonts and general presentations, some of which vary only slightly from defendants' use of the TROPICANA mark.[6]

This Polaroid factor clearly favors plaintiff.

## 3. Proximity of the Products

The Second Circuit has described this Polaroid factor as follows:

> The "proximity of the products" inquiry concerns whether and to what extent the two product compete with each other... We look to "the nature of the products themselves and the structure of the relevant market." Vitarroz v. Borden, 644 F.2d 960, 967 (2d Cir.1981). Among the considerations germane to the structure of

the market are the class of customers to whom the goods are sold, the manner in which the products are advertised, and the channels through which the goods are sold.

Cadbury Beverages, Inc. · v. Cott Corp., 73 F.3d 474, 480 (2d Cir.1996). Plaintiff states simply that the "parties' services are directly competitive: both render casino gambling services to the gambling public in the New York metropolitan area" and "[b]oth advertise in the same media." Pl. Mem. at 13. It also cites to defendants' advertisements, which emphasize that defendants offer "Las Vegas Style Casino" and "Las Vegas Rules Casino." Pl. Rep. Mem. at 12. See Pl. 56.1, Ex. 7 (Collins Dep.), Ex. 5. In response, defendants argue—relying exclusively on the Collins Declaration[7]—that the parties are not in direct competition because "[t]he type of gambler interested in a five-to-six hour captive cruise differs from the type of gambler interested in large-city strip casinos." Def. Mem. at 19.

Irrespective of Collins' averment that "[t]he type of gambler interested in a five-to-six hour captive cruise differs from the type of gambler interested in large-city strip casinos," it is clear that some gamblers would gamble anywhere, on a cruise casino or a strip casino. That the profile of the customers of these two types of casinos is different does not indicate that the two types of casinos are not in competition. In addition, it is noteworthy that the parties indisputably advertise, at least in part, in similar channels, see, e.g., Pl. 56.1, ¶ 35; Def. 56.1, ¶ 35 (parties ran advertisements adjacent to the other in the New York Daily News Fall Casino Guide section), and both direct their services to the gambling public in the New York metropolitan area.

This factor favors plaintiff.

---

6. In addition, Aztar registered for use of the TROPICANA mark in plain typeface. See Pl. 56.1, Exs. 1,2. Like the mark discussed in Sports Authority, Inc. v. Prime Hospitality Corp., 89 F.3d 955, 961 (2d Cir.1996), protection of the mark in question is not limited to any logo, but to the words themselves.

7. The Collins Declaration provides as follows: "I have worked in the gambling and entertainment business for over 40 years. In my experience, the type of customer interested in a five-to-six hour cruise that charges a $50 admission fee and that provides entertainment activities including a casino, differs from the type of consumer interested in large-city strip casinos in Atlantic City and Las Vegas." Collins Decl., ¶ 10.

#### 4. *Bridging the Gap*

According to plaintiff, there is no "bridging the gap" issue because the parties are directly competitive. Plaintiff also points to its ownership of two riverboat casinos. Pl. Mem. at 13. In response, defendants state that the products are not competitive and notes that plaintiff did not designate either of the riverboat casinos as a "Tropicana" casino.

This factor measures the likelihood that plaintiff will enter defendants' business. *Cadbury*, 73 F.3d at 482. Plaintiff is already in the casino business and there is therefore no bridge to gap. In any event, given that plaintiff already owns two riverboat casinos, it is likely that plaintiff will eventually enter the casino cruise business.

This factor favors plaintiff.

#### 5. *Actual Confusion*

■ "For purposes of the Lanham Act, actual confusion means 'consumer confusion that enables a seller to pass off his goods as the goods of another.'" *Sports Authority*, 89 F.3d at 963 (quoting *W.W.W. Pharmaceutical Co. v. Gillette Co.*, 984 F.2d 567, 574 (2d Cir.1993)). To show actual confusion, Aztar "must demonstrate that [defendants'] use 'could inflict commercial injury in the form of either a diversion of sales, damage to goodwill, or loss of control over reputation.'" *Id.* (quoting *Lang v. Retirement Living Publishing Co.*, 949 F.2d 576, 583 (2d Cir.1991)).

Aztar points to several incidents which, it claims, demonstrate actual confusion. Most of these involve vendors who initially believed that the M/V Tropicana was associated with Aztar or its properties. *See* Pl. 56.1, Exs. 9–11. In one of these incidents, however, the vendor was not confused, but simply asked his wife to "call Tropicana and find out what that is; is that part of the Tropicana operations or is it not." Pl. 56.1, Ex. 9 at 26. Similarly, the same vendor also stated that he received inquiries regarding whether the M/V Tropicana was associated with plaintiff. *Id. See Gruner + Jahr USA Publishing v. Meredith Corp.*, 991 F.2d 1072, 1079 (2d Cir. 1993)("[i]t was proper for the trial court to consider this testimony not as evidence of actual confusion, but rather as showing only

queries into the possible relationship between the parties' publications"); *Programmed Tax Systems, Inc. v. Raytheon Co.*, 439 F.Supp. 1128, 1131 (S.D.N.Y.1977)(court regards inquiries as to relationship between products as not indicative of actual confusion). In another of these incidents, a vendor called plaintiff to discuss the M/V Tropicana; however, the vendor was aware that the ship was not affiliated with plaintiff. Pl. 56.1, Ex. 11 at 40. Finally, in the two other incidents cited by plaintiff, the name BIG APPLE had not yet been painted on the bridge and ship was still identified as part of the Tropicana Casino Cruise Lines, Pl. 56.1, Ex. 12, Ex. 10 at 17, and the issue at hand was not clearly presented. This factor is neutral.

#### 6. *Good Faith*

■ "Under this factor, we look to 'whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product.'" *Sports Authority*, 89 F.3d at 964 (quoting *Lang*, 949 F.2d at 583). Defendants contend that they "adopted the name of its [sic] ship and casino in good faith, without knowledge of plaintiff's marks, and without the intent to trade on their alleged goodwill." Def. Mem. at 32. They also note that they merely returned the ship to a name that it had previously held and at a time where plaintiff called its Atlantic City property "Trop World." *Id.* Plaintiff argues that bad faith is evident:

> While Mr. Collins would have us believe that he never heard of TROPICANA casino resorts in Las Vegas or Atlantic City, he also claims that he has been in the gaming business all of his life... He has traveled frequently to Las Vegas, though purports to have never been in Atlantic City... He asserts that he never heard of the TROPICANA casino in either of these gaming Meccas, a claim that stretches credulity... The use of one of the oldest and best known names in the casino gaming industry to identify his floating casino can only be for the purpose of trading on the consumer recognition of the name... Collins' denial that he did not [sic] adopt the

name TROPICANA for the purpose of trading on the recognition of, and goodwill in, Aztar's TROPICANA trademark is just not credible.

Pl. Mem. at 17.

Plaintiff has introduced no evidence that defendants were aware of its use of the TRO-PICANA mark in conjunction with casino gambling when they renamed the ship M/V Tropicana. Even if it strains credulity to believe that Collins would not be familiar with the Tropicana casino properties in Las Vegas or Atlantic City, that is properly a determination that should be made by the trier of fact.

However, defendants' continued use of the name TROPICANA after the Office Action does evidence bad faith. *See Sports Authority,* 89 F.3d at 963 (court notes that defendant continued to expand its use of the mark at issue after receiving notice of plaintiff's use of the mark and that this continued expansion was evidence of bad faith). Moreover, representations that were made by the defendants at the July 14, 1997 hearing for the preliminary injunction—in particular, defendants' representation that the name Tropicana Cruise Line was painted over and replaced with the name Big Apple, Pl. 56.1, ¶ 16; Def. 56.1, ¶ 29—is, when viewed in conjunction with picture of the side of the ship presented during oral argument [8], evidence of bad faith on part of defendants.

This factor favors plaintiff.

### 7. Quality of Defendants' Product

■ "This factor generally considers whether the senior user's reputation could be 'tarnished by [the] inferior merchandise of the junior user.'" *Id.* (quoting *Scarves by Vera, Inc. v. Todo Imports Ltd.,* 544 F.2d 1167, 1172 (2d Cir.1976)). Plaintiff has stated simply that the quality of defendants' products is unknown and that neither it nor

any government regulatory body would be able to ensure the quality of the services provided by defendants. In response, defendants point to their operation of the M/V Tropicana for two years from the Port of Miami, the high quality services that they offered during that period and their successful entertainment of thousands of consumers. Youmans Decl., ¶ 2. Aztar has offered no evidence of an inferior product. This factor favors defendants.

### 8. Sophistication of the Buyers

Finally, the sophistication of the buyers must be considered. "[W]e must consider '[t]he general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods....'" *W.W.W. Pharmaceutical,* 984 F.2d at 575.[9] Plaintiff argues that because the products and marks are identical, "the sophistication of buyers cannot be relied on to prevent confusion." Pl. Mem. at 20 (quoting *Banff, Ltd. v. Federated Dept. Stores, Inc.,* 841 F.2d 486, 492 (2d Cir.1988)). In response, defendants merely state that "[w]here, as here, the marks are very different in appearance, and the manner in which the products are offered also differs greatly, potential customers ... can tell the difference between plaintiff's Tropicana gambling casino and a Big Apple Casino on board a ship named the M/V Tropicana." Def. Mem. at 33.

As is discussed above, however, neither the marks nor the products—which are both casino products—are very different. This factor favors plaintiff.

### 9. Survey Evidence

Aztar has also submitted evidence of a survey which it contends demonstrates a likelihood of confusion. However, defendants' expert has raised significant issues

---

8. *See also* Pl. 56.1, Ex. 19; Ex. 7 (Collins Dep.), Ex. 15.

9. Citing to *Ford Motor Co. v. Summit Motor Products, Inc.,* 930 F.2d 277, 283 (3d Cir.1991), plaintiff argues that the "standard of care to be exercised by the reasonably prudent purchaser will be equal to that of the least sophisticated con-

sumer in the class." This formulation arose in a scenario involving a mixed class of buyers consisting of both ordinary consumers and professional buyers. *See also* J. McCarthy, 2 *McCarthy of Trademarks and Unfair Competition* § 23:99. Plaintiff has not submitted evidence of such a mixed class of buyers.

regarding the accuracy and reliability of the survey, questioning, *inter alia*, (1) whether the interviewers asked leading questions, (2) whether the survey encouraged guessing (in particular, noting that over 19% of those interviewed believed the ship to be owned or operated by Donald Trump), and (3) whether the survey adhered to standards of objectivity. Williams Aff., Ex. D (Jacoby Report).

Defendants have pointed to possibly serious defects in the survey and have thereby raised issues of fact that would ordinarily be determined by the trier of fact. *See Jim Beam Brands Co. v. Beamish & Crawford Ltd.*, 937 F.2d 729, 736 (2d Cir.1991)("[i]f, despite the compound form of its questions ... that survey is eventually ruled admissible in evidence ... it would be the province of the finder of fact to determine what weight to accord the responses"); *Imax Corp. v. Showscan Entertainment Inc.*, 96 Civ. 969, 1997 WL 193174, *1 (S.D.N.Y. April 18, 1997)(same).

▮ It should be noted, however, that plaintiff need not present survey evidence or demonstrate actual confusion to succeed on its motion for summary judgment. As the Second Circuit remarked in *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 875 (2d Cir.1986), "it is black letter law that actual confusion need not be shown to prevail under the Lanham Act, since actual confusion is very difficult to prove and the Act requires only a likelihood of confusion as to source." Given that defendants have not yet begun to offer casino cruise services in New York City, the reasoning of *Lois* is particularly apt. *See Simon & Schuster, Inc. v. Dove Audio, Inc.*, 970 F.Supp. 279, 298–99 (S.D.N.Y.1997)(given short time that offending product was on the market, failure of plaintiff to introduce a reliable survey did not impair its right to injunctive relief).

### C. *Trademark Infringement/Overview*

Based on the analysis presented above, this Court grants plaintiff's motion for summary judgment. Most of the factors clearly favor plaintiff—the strength of the mark, the

degree of similarity between the two marks, the proximity of the products, bridging the gap, good faith and sophistication of the buyers. One factor, actual confusion, is neutral and one factor, the quality of defendants' product, favors defendant.

### D. *Attorneys Fees and Costs* [10]

▮ The Lanham Act authorizes the award of attorneys fees in "exceptional cases." 15 U.S.C. § 1117(a). Such an award is available only where there is evidence of fraud or bad faith. *Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 194 (2d Cir.1996). As is discussed above, there *is* evidence of bad faith here, but this evidence most clearly supports a finding of bad faith with respect to representations made concerning painting over the Tropicana Cruise Line name. An award of attorneys fees for the preparation and argument of this motion is appropriate.

### *CONCLUSION*

For the foregoing reasons, plaintiff's motion for summary judgment is granted and defendants' cross-motion to dismiss is denied. Defendants are enjoined from (1) displaying the name TROPICANA except on the prow and stern of the M/V Tropicana in the same manner as which it is currently displayed on the prow and (2) advertising its services as Tropicana Cruise services.

Because summary judgment has been granted in favor of Aztar, the dilution claims have not been addressed. If Aztar intends to press the dilution claims or seek to enjoin use of the name M/V Tropicana, it is directed to notify the Court within thirty days of the date of this Memorandum and Order.

This matter is now directed to the attention of the Magistrate for a determination of costs and attorneys fees.

SO ORDERED.

---

**10.** Although defendants purport to oppose the award of costs, Def. Mem. at 40, they do not provide any basis for their opposition. Both Fed.R.Civ.P. 54(d) and the Lanham Act, 15 U.S.C. § 1117(a) state that the prevailing party is entitled to an award of costs.