**Vernon E. COPELAND Plaintiff,**

v.

**SEARS, ROEBUCK AND CO. and Margaret Lare, Defendants.**

**No. 96 Civ. 4102 (BDP).**

United States District Court,
S.D. New York.

Nov. 10, 1998.

Michael H. Sussman, Sussman Law Offices, Goshen, NY, for Plaintiff.

Joseph A. Saccomano, Jr., Jackson, Lewis, Schnitzler & Krupman, White Plains, NY, for Defendants.

## MEMORANDUM DECISION AND ORDER

PARKER, District Judge.

Plaintiff Vernon Copeland asserts various claims against Defendants Sears, Roebuck and Co. ("Sears") and its employee Margaret Lare, based on race discrimination under 42 U.S.C. § 1981 and § 296 of the Executive Law of the State of New York, and retaliation under 42 U.S.C. § 1981 and § 296 of the Executive Law of the State of New York. The defendants have moved for summary judgment. For the reasons stated below the defendants' motion is denied in part and granted in part.

### BACKGROUND

The pertinent facts, construed in favor of the plaintiff, are as follows. On May 30, 1996 Vernon Copeland commenced this action for race discrimination and retaliation based on his experience as an employee at Sears. Copeland is an African American who has worked at the Sears' Fishkill Service Center since 1972. He is a road service technician and is provided a company truck to travel to customers' residences to repair appliances on site. Copeland has attained the level of Grade III service technician, which is the highest non-supervisory grade a service technician can attain. Margaret Lare, a white female, has both directly and indirectly supervised Copeland since 1986 in her position as unit manager and/or technical supervisor. Lare has issued performance evaluations regarding his work at the Fishkill Center. Since 1990, Copeland's technical supervisors have included, in addition to Lare, Rick Cardin and Jim Ryan. These technical supervisors report directly to the District Services Manager, George Downing.

From 1992 to 1996, Copeland requested that Sears provide him training in sealed systems work. Sealed systems work entails replacing Freon and replacing or repairing compressors in refrigerators. Copeland began this training in December 1995 and was certified in July 1997. Copeland believes this delay was a discriminatory denial of "promotional opportunities." In or about July 1994, Copeland learned that a shop techni-

cian at the Fishkill Center, Kandee Lee Karge, a white female, was earning more than he, even though he believed he had more seniority and was more productive. Karge's hourly wage was $16.53 and Copeland's hourly wage was $16.24. Copeland asked Lare about the discrepancy and was told that it was probably because Karge was more productive.

In January 1994, Copeland notified his superiors that he would be going on vacation from December 27, 1994 until January 2, 1995. In early September 1994,the stand-by list was posted, and Copeland noticed that he was scheduled for stand-by duty from December 19 to December 25, 1994, two days before his approved vacation. Stand-by commences after the normal business day ends, and the stand-by technician is on call to perform emergency service for a twenty-four hour period. From September to November 1994 Copeland repeatedly asked his supervisors to arrange a swap of his stand-by duty and was told the matter would be resolved. Copeland met with Lare and Ryan on December 14, 1994 regarding stand-by duty. Ryan told Copeland he had another technician in mind to cover for him, but Copeland told Ryan that he did not want to burden another technician with a problem Copeland felt Sears' management should have resolved. Copeland claims Sears, in contrast to its treatment of him, resolved a stand-by duty conflict for a white technician, Steve Carey. In any event, none of the stand-by days directly conflicted with Copeland's scheduled vacation days and Copeland performed his scheduled stand-by duty.

Copeland claims that defendants required him to work overtime without paying him overtime rates. Copeland did not, however, actually work overtime without receiving overtime pay. This claim relates exclusively to Copeland's release from work on December 9, 1994. On December 4 and 5, 1994 Copeland had jury duty and did not work. Time spent on jury duty, however, does not count towards the 40 hours that must physically be worked to qualify for overtime pay. On December 7 and 8, 1994, Copeland worked two 10 hour days and on December 9, 1994, the Albany routing office scheduled Copeland for a regular route of customers. Copeland calculated that if he had worked that entire day he would have worked more than twenty four hours that week (i.e. forty hours minus the sixteen hours of jury duty). Copeland asked Ryan whether he could work only four hours on December 9, 1994, thus working a total of 40 hours if the 16 hours of jury duty was included in Copeland's total worked hours. After Ryan spoke to Rick Cardin, the routing supervisor in Albany, Ryan told Copeland that Cardin wanted him to leave work for the day. Copeland claims Cardin discriminated against him on account of his race by sending him home.

Copeland next claims race discrimination regarding the servicing of his truck. Specifically Copeland claims that during his tenure he has not received a new service truck, that Sears failed to replace his service truck with a larger truck to accommodate his knee problems, and that Sears failed to timely replace the exhaust system of his service truck.

In August 1995, Copeland met with George Downing, the District Services Manager, and told Downing: (1) he believed employees with less seniority were being paid more than he, (2) he wanted to receive training in sealed systems, and (3) about the conflict regarding his 1994 stand-by duty. Downing told Copeland that he would investigate. In September 1995, Copeland and Downing met for about two hours. Downing gave Copeland a handwritten document setting out Copeland's annual performance ratings and his salary as it evolved during his career. Copeland admits that the numbers were correct. At Copeland's request, Downing called Wayne Hines, the regional human resources manager and told Hines that Copeland wanted to speak to him. In October 1995, Copeland and Hines met. During this meeting, Copeland reviewed his various complaints with Hines, in particular his race discrimination claim. Hines told Copeland he would look into his concerns. Hines then investigated, speaking to minority and non-minority employees. The only criticism Hines had after his investigation was that it was poor management policy to approve vacation days early in the year and then later schedule stand-

by duty without considering the previously approved vacation time.

Copeland claims that after he made these internal complaints about discrimination and commenced this lawsuit he has been the subject of retaliation. Specifically, Copeland claims that Lare started to micro-manage him in the fall of 1995, humiliated him by ordering him to leave a meeting because he arrived late, requested that he be transferred to another unit, and disciplined him for being absent from work for a deposition even though Copeland claims he told management of his need to miss work for this reason.

## DISCUSSION

### 1. Summary Judgment Standard

A motion for summary judgment should only be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Hayes v. New York City Dep't. of Corrections*, 84 F.3d 614, 619 (2d Cir.1996); *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.1991). The court is to perform "the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *McNeil v. Aguilos*, 831 F.Supp. 1079, 1082 (S.D.N.Y.1993) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)); *Hayes*, 84 F.3d 614 at 619.

In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities in the light most favorable to, and draw all reasonable inferences in favor of, the party opposing the motion. *Wernick v. Federal Reserve Bank of New York*, 91 F.3d 379, 382 (2d Cir.1996); *In re State Police Litigation*, 88 F.3d 111, 123 (2d Cir. 1996). The Court must not weigh evidence or assess the credibility of potential witnesses, for such evaluations are to be conducted solely by the jury. *Hayes*, 84 F.3d at

619; *United States v. Rem*, 38 F.3d 634, 644 (2d Cir.1994); *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 517 (2d Cir.1994). A finding of disputed material facts that could reasonably be resolved in favor of either party precludes summary judgment. *Wernick*, 91 F.3d at 382 (quoting *Anderson v. Liberty Lobby*, 477 U.S. at 250, 106 S.Ct. 2505).

Generally, the burden is on the moving party to demonstrate that there is no genuine dispute respecting any material fact and that he is entitled to judgment as a matter of law. *In re State Police Litigation*, 88 F.3d at 123; *Gallo v. Prudential Residential Services, Limited Partnership*, 22 F.3d 1219, 1223 (2d Cir.1994). To successfully oppose a motion for summary judgment, the responding party "must set forth facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e). A summary judgment motion cannot be defeated through mere speculation or conjecture. *Pollis v. New School for Social Research*, 829 F.Supp. 584, 586 (S.D.N.Y. 1993) (citing *Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir.1990) (other citations omitted)).

While our Circuit has suggested caution in granting summary judgment in discrimination cases where intent is in issue, *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir.1994), the Court subsequently emphasized the availability of summary judgment in such cases. *McLee v. Chrysler Corp.*, 109 F.3d 130, 134 (2d Cir.1997).

### 2. Race Discrimination Claim

#### A. Statute of Limitations

■ Defendants claim that because the statute of limitations under § 1981 is three years, *Butts v. City of New York Dep't of Housing*, 990 F.2d 1397, 1412 (2d Cir.1993), any of plaintiff's claims regarding the failure to receive sealed systems training prior to May 30, 1993 are time-barred. This assertion is correct. Thus, plaintiff's claims prior to May 30, 1993 regarding his request to receive sealed systems training are time-barred. *See Abidekun v. New York City Transit Auth.*, No. 93 Civ. 5600, 1998 WL 296372, at *2 (June 4, 1998) (unlike Title VII, statute of limitations under § 1981 is not

based upon filing of a claimant with the EEOC). In any event, whether Copeland bases his claim of race discrimination on the request to receive training starting from 1992 or 1993, has no bearing on our final determination since we conclude Copeland has not demonstrated that Sears' conduct in this regard was discriminatory.

### B. Prima Facie Case

■ To establish a *prima facie* case of race discrimination under § 1981, the plaintiff must show that (1) he belongs to a protected class, (2) he performed his duties satisfactorily, (3) adverse employment action was taken against him, and (4) adverse action occurred in circumstances giving rise to an inference of discrimination based on his membership in that class. *See McLee v. Chrysler Corp.*, 109 F.3d 130, 134 (2d Cir. 1997); *See generally Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

■ Once the plaintiff has presented a *prima facie* case of discrimination, the defendant has the burden of producing reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action. *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir.1997) (citation omitted). In order to defeat summary judgment after such a showing by the defendant, the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational fact finder to infer that the defendant's employment decision was more likely than not based on discrimination. *Id.* If the plaintiff's evidence was barely sufficient to make out a *prima facie* case, it may not be sufficient to establish discrimination after the defendant has proffered a neutral explanation. *Id.* (citing *Fisher v. Vassar College*, 114 F.3d 1332, 1337, 1342, 1346 (2d Cir.1997) (en banc), *cert. de-*

*nied,* —— U.S. ——, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998)).

■ Neither party disputes that Copeland has established the first and second prongs of a *prima facie* case. We agree with the defendants, however, that Copeland has not met the third and fourth prongs. To qualify as adverse employment action under the third prong (adverse employment action), the conduct complained of must affect a term, privilege, duration or condition of plaintiff's employment. *Cooper v. New York State Dep't of Human Rights*, 986 F.Supp. 825, 828 (S.D.N.Y.1997) (citation omitted). Although adverse employment action is not defined solely based on reduced wages and benefits, the actions complained of must affect employment in some substantial, meaningful way. *See id.* (citation omitted). Except for Copeland's allegation concerning his hourly wage, none of his allegations of race discrimination affect a term or condition of his employment. Copeland's allegation of delay in receiving his sealed systems did not affect Copeland's wage or deny him a promotion.[1] Also, since July 1997 Copeland has been certified as a sealed systems technician. At all times Copeland, as a road technician had a company provided service truck, thus Copeland's claims regarding the replacement of his truck did not affect a term or condition. Similarly, defendants' failure to find Copeland a replacement for his stand-by duty did not affect his entitlement to his scheduled vacation. The stand-by duty only affected his personal preference to leave for his vacation early. Finally, Cardin's decision to send Copeland home for the day did not impact Copeland's condition of employment, especially in view of the fact that Copeland did not want to work a regular day on the date he was sent home, he only wanted to work four hours.

■ Further, Copeland has not met the fourth prong of the *prima facie* test because he has not established that any adverse em-

---

1. Downing in his deposition stated that certification as a sealed systems service technician does not qualify the technician for any promotion, nor does it directly lead to any wage increase. This is offered by defendants as an undisputed fact. *See* Defendants' Statement of Undisputed Facts, ¶ 42. Plaintiff denies this fact by stating in his

Reply to Defendants' Statement of Undisputed Facts that several service technicians stated to him that they received more money for sealed systems work. Plaintiff, however, offers no admissible evidence for this contention (i.e. depositions or affidavits from these service technicians). Thus, this fact is conceded.

ployment actions occurred under circumstances giving rise to an inference of discrimination based on his race. *See Fisher,* 114 F.3d at 1339. Copeland's deposition testimony makes abundantly clear that he has not adduced evidence of any verbal or written statements which tend to indicate Sears discriminated against him on account of his race. Copeland's complaints largely concern the legitimate exercise of supervisory authority by Sears of the sort that routinely occurs in most employment relationships. Since supervision and race discrimination are very different, the case law makes clear that a discriminatory animus cannot be inferred from the day-to-day conduct of supervisors that Copeland may deem inconvenient, inconsiderate or insufficiently solicitous. *See Spence v. Maryland Cas. Co.,* 803 F.Supp. 649, 670 (W.D.N.Y.1992), *aff'd* 995 F.2d 1147 (2d Cir.1993) (holding that intimidating behavior of plaintiff's manager may be evidence of impersonable and overly aggressive manager, but without more it does not demonstrate that his actions were motivated by a discriminatory animus).

Copeland also has not established that he was treated differently than similarly situated white service technicians. *See Montana v. First Federal Savings and Loan Ass'n of Rochester,* 869 F.2d 100, 106 (2d Cir.1989) (holding Title VII plaintiff bears the burden of showing the similarity between her situation and those of other employees she claims received favorable treatment). Copeland admits that he and a white employee asked for sealed systems training and received the training at the same time, and that a white employee complained about his wage. *See* Defendants' Statement of Undisputed Facts, ¶ 140, Copeland Dep., page 282, 278–279. Also, Sears has shown that it, in fact, did not find a stand-by replacement for Carey as alleged by Copeland. *See* Packard Aff., ¶ 6. Copeland also has alluded to some jokes made by co-workers to evidence racial animus. Isolated remarks, however, cannot alone create a material issue of fact to defeat summary judgment. *Spence,* 995 F.2d at 1155; *See also O'Connor v. Viacom Int'l Inc.,* No. 93 Civ. 2399, 1996 WL 194299 at *4–5

(S.D.N.Y. Apr.23, 1996). Further, Copeland concedes that Lare reprimanded the others when she heard a stray remark that could have been offensive. Copeland Dep., page 274. In view of these factors, we conclude that Copeland has not established a *prima facie* case of race discrimination.

### C. Defendants' Proffered Reasons for Their Actions

Even assuming, *arguendo* that Copeland had established a *prima facie* case, the defendants have overcome that claim with sufficient evidence that their conduct was motivated by non-discriminatory business reasons.

■ With respect to Sears' initial refusal to find Copeland a replacement for his stand-by duty, Sears has a practice that if a service technician cannot perform his scheduled stand-by duty, the service technician must obtain his own replacement. Supervisors try to find replacements only in exceptional circumstances such as illness or termination. *See* Downing Dep., page 66; Packard Aff., ¶¶ 4–5. Copeland's managers did, however, offer assistance to Copeland by recommending a service technician to replace Copeland, but told Copeland that he would have to ask the technician. Copeland chose not to ask this particular technician. Defendant's Statement of Undisputed Facts, ¶ 104. Further, Copeland alleges that managers did find a replacement for a white technician, Steve Carey. Defendants, however, as stated above, have demonstrated that this simply did not occur. Packard Aff., ¶ 6.

■ With respect to Copeland's allegations regarding his service truck, Sears' has provided a reasonable explanation for its conduct. Sears' corporate office decides once a year whether to replace service trucks. Lare Aff., ¶ 18. Sears will replace a service truck usually when the truck has accumulated between 125,000 to 150,000 miles. Lare Aff. ¶ 19. Sears does not take other factors, such as seniority, into consideration when deciding which service technicians get new trucks. Lare Aff. ¶ 21; Defendants' Statement of Undisputed Facts, ¶¶ 155, 156, 158.[2]

---

2. In Plaintiff's Reply to Defendants' Statement of

Undisputed Facts, plaintiff denies these facts as

As of December 1997, Copeland's service truck had less than 125,000 miles on the odometer. Sears has a monthly maintenance and repair budget for its service trucks. Defendants' Statement of Undisputed Facts, ¶ 166. Lare authorizes requested repairs if the anticipated expenditure will be within that month's budget. As a result, sometimes repairs will not be performed immediately and will have to wait until the next month. Defendants' Statement of Undisputed Facts, ¶ 167. When Copeland asked for a larger truck, no spare truck was available at the Fishkill Service Center. With the transfer of a co-worker, Copeland was given the transferred employee's larger truck. Defendants' Statement of Undisputed Facts, ¶ 176. Also between 1994 and 1995 five road technicians received new service trucks. Two of these recipients were minorities. Defendants' Statement of Undisputed Facts, ¶¶ 159, 160.

 With respect to Copeland's allegations that his hourly wage was lower because of his race, Sears has a formula to determine the annual wage increase of service technicians. Sears determines annual wage increases on the basis of a matrix prepared by Sears' corporate office. The matrix considers the service technician's performance review relative to the percentage of the midpoint or target rate. Copeland disputes this statement to the extent that Sears claims it only looks at objective criteria. Copeland claims that such determinations such as a rating for "team player" are subjective. Both parties agree, however, that the primary performance criteria for road technicians is the number of service calls completed. Defendants' Statement of Undisputed Facts, ¶ 122. Also both parties agree that under this rating system, service technicians with lesser years of service, but with consistent high productivity levels, could earn more than those with longer years of service, but lower productivity. Defendants' Statement of Undisputed Facts, ¶ 133.

Specifically, Copeland claims that Kandee Lee Karge, a white female earned more than he in 1994, even though he had more years of service and was more productive. In July 1994, Copeland saw Karge's pay slip and calculated that she was paid at an hourly rate of $16.53, while he was paid at $16.24, i.e. a difference of 29 cents per hour. From 1992 to 1996, however, Karge's overall annual performance rating was higher than Copeland's rating. Defendants' Statement of Undisputed Facts, ¶ 145. Plaintiff denies this fact to the extent that Lare's subjective judgment of Karge's performance could have raised the overall rating. Plaintiff's Statement of Undisputed Facts, ¶ 145. During August 1995, District Services Manager George Downing investigated Copeland's claim of wage discrimination and confirmed that Copeland's pay increases between 1989 and 1994–1995 were calculated based on the formula Sears uses to determine increases and consistent with Sears' pay policy. Defendants' Statement of Undisputed Facts, ¶ 146.

 As to Copeland's claim that he was passed over for sealed systems training and should have received the training earlier, Sears has provided sufficient admissible evidence that not every service technician does sealed systems work because the work requires a significant investment by Sears in special equipment and tools. As a result, at every service center, Sears trains and equips the service trucks of only a limited number of service technicians. Lare Dep., page 114; Downing Dep., page 49. During August 1995, when Copeland met with Downing, Sears did not have a business need to train Copeland in sealed systems work. Defendants' Statement of Undisputed Facts, ¶ 62. During December 1995 and February 1996, Copeland and a white technician started to receive sealed systems training. Defendants' Statement of Undisputed Facts, ¶ 64. The training, however, was suspended because new environmental protection laws required

well as numerous other facts by stating he lacks "direct knowledge." Plaintiff, however, has not created any issues of fact through this artifice. *See Aztar Corp. v. N.Y. Entertainment*, 15 F.Supp.2d 252, n. 1 (E.D.N.Y.1998). Under Local Rule 56.1 "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party." *Id.* (citing *Toyomenka Pacific Petroleum, Inc. v. Hess Oil Virgin Islands Corp.*, 771 F.Supp. 63, 67 (S.D.N.Y.1991)). Thus, these facts are conceded.

the purchase of new equipment. Defendants' Statement of Undisputed Facts, ¶ 66. Shortly after July 1997, when the Fishkill Service Center received the new equipment, Copeland and the other technician completed their training. Defendants' Statement of Undisputed Facts, ¶ 74.

Considering this evidence, Sears has proffered legitimate non-discriminatory business reasons for its treatment of Copeland and now the burden shifts to Copeland to prove pretext. *See Stern,* 131 F.3d at 312. The plaintiff has not met this burden because there is not sufficient evidence from which a rational fact finder could infer that defendants' actions toward plaintiff are a mere pretext for discrimination. Copeland points to Lare's contention that Copeland stated "I'll probably get mine last because I'm Black" and "there goes just another thing" as statements that could lead a reasonable fact finder to infer that Lare held stereotypical views of African Americans and to show pretext. These statements, however, were not made by Lare. She merely repeated statements she believed Copeland had made to her. Copeland, however, denies having made these statements. In any event, assuming Copeland did not make these statements, we do not believe a reasonable fact finder could infer that the statements made by Lare are stereotypical views of African Americans and establish pretext. Copeland also points to Lare's statement that "some people they're just not meant to do other things" to show pretext. Copeland claims that this statement was made in reference to training minorities. But a reading of the statement in the deposition in context shows that Lare's statement was in regards to Sears' training process generally, not the training of minorities. Lare Dep., page 59. This evidence, coupled with Copeland's failure to prove he was treated worse than similarly situated white technicians, does not establish that defendants' proffered reasons were pretextual.

### D. Sears' Liability Under Federal Law

Defendants also contend that under federal law an employer is liable for race discrimination at the workplace by an employee's coworkers only if the employer had knowledge of, and failed to take reasonable steps to remedy, the situation. *Snell v. Suffolk County,* 782 F.2d 1094, 1104 (2d Cir.1986). After Copeland complained to District Services Manager George Downing about the way he was treated, Downing met with Copeland, investigated his complaint, and, within a month, met with Copeland to report his findings. Copeland also met with Regional Human Resources Manager Wayne Hines to discuss his claims of race discrimination. Hines also investigated Copeland's claims.

■ These steps by Sears to investigate Copeland's allegations were reasonable. Accordingly, Copeland's federal claims based on race discrimination are dismissed. In view of the dismissal at this stage of plaintiff's federal claims, this Court declines to entertain his state claims based on race discrimination. *See, e.g., Salim v. Proulx,* 93 F.3d 86, 92 (2d Cir.1996); *Lennon v. Miller,* 66 F.3d 416, 426 (2d Cir.1995).

### 2. Retaliation

■ A plaintiff establishes a *prima facie* case of retaliation by proving by a preponderance of the evidence that: (1) he or she was participating in protected activity known to the defendant, (2) he or she was subject to adverse employment action or employment action disadvantaging the plaintiff, and (3) a causal connection exists between the protected activity and the adverse employment action. *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1308 (2d Cir.1995). The same analysis that is applied to Title VII employment discrimination claims governs § 1981 claims. *McKinney v. Lanier Worldwide, Inc.,* No. 94 Civ. 8139, 1998 WL 677544 at *7 (Sept. 29, 1998) (citing *Patterson v. McLean Credit Union,* 491 U.S. 164, 186, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989)). Under New York Executive Law § 296, a *prima facie* case of retaliation also "requires evidence of a subjective retaliatory motive for the [employment action]." *Pace v. New York Human Rights Comm.,* 85 N.Y.S.2d 125, 128, 623 N.Y.S.2d 765, 647 N.E.2d 1273 (1995).

■ We find that there are genuine issues of material fact precluding a grant of summary judgment based on retaliation under federal and state law. Copeland claims

that once he filed internal complaints and his lawsuit, Lare began to micro-manage his work and retaliate against him by: (1) asking him why he was alone in the parts department, (2) calling his physician's office regarding his illness when he was absent from work because he was ill, (3) asking him to leave a September 1995 meeting after arriving forty minutes late, and (4) emailing Downing inquiring into whether Copeland could be transferred to another unit. Lare states in her deposition that she made the transfer request because, *inter alia*, Copeland's lawsuit was disrupting the workplace and she needed to focus the workers on their jobs. Lare Dep., pages 169–170, 187–195. Copeland submits several emails by Lare which a reasonable fact finder could interpret as increased micro-management and skepticism over Copeland's illnesses and/or family emergencies. Plaintiff's Exhibits, 15, 17, 19, 21, & 23.

Copeland also claims he was unjustly written up for failing to notify the Albany routing office of his absence to attend a deposition in this case. Copeland claims that he told Mike Kingley of the Albany routing office that he would be absent. Defendants' claim that the routing office was not aware that Copeland would be absent. This fact cannot be resolved based on the parties' submissions and precludes us from granting summary judgment.

■ Defendants contend that Copeland fails to meet the second (adverse employment action) and third (causal link between protected activity and adverse employment action) prongs of a *prima facie* case. We disagree and find that Copeland has established a *prima facie* case of retaliation. Copeland was engaged in protected activity (i.e. filing the lawsuit). The proximity in time between plaintiff's complaints and the alleged adverse employment actions are sufficient circumstantial evidence of causation to preclude summary judgment. *Dortz v. City of New York*, 904 F.Supp. 127, 157 (S.D.N.Y. 1995) (citation omitted). Copeland's allegations of adverse employment action all occurred in the fall of 1995 and 1996, the same time frame in which he filed his internal complaints and this lawsuit. Further, Lare admits that the lawsuit caused her request for Copeland's transfer. Further, Copeland

has presented various examples from which a reasonable fact finder could conclude that he suffered adverse employment action. Although this question is extremely close, on a summary judgment motion Copeland prevails. Further, retaliatory conduct may consist of action less severe than discharge. *See Dortz v. City of New York*, 904 F.Supp. 127, 156 (S.D.N.Y.1995) (court concluded that with respect to *prima facie* case, plaintiff had submitted evidence to support conclusion that she had suffered adverse employment action; such evidence included negative evaluations, increased supervision); *Linares v. City of White Plains*, 773 F.Supp. 559, 561–62 (S.D.N.Y.1991) (interference with plaintiff's job, isolating him, excluding him from meetings, pressuring him not to bring lawsuit were among actions a fact finder could conclude were adverse); *Johnson v. DiMario*, 14 F.Supp.2d 107, 110 (D.D.C.1998) (written reprimand placed in employee's personnel file was adverse action sufficient to establish prima facie case of retaliation). Thus, we deny defendants' motion for summary judgment on Copeland's retaliation claims because genuine issues of material fact exist.

### CONCLUSION

For the foregoing reasons, the defendants' motion is granted in part and denied in part. A pre-trial conference will be held at 9:45 a.m. on November 18, 1998.

**SO ORDERED.**